In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 01-1657

TEJPAUL S. JOGI,

*Plaintiff-Appellant,*

v.

TIM VOGES, *et al.,*

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-2067—**Harold A. Baker**, *Judge.*

---

ON PETITION FOR REHEARING[Œ]

---

NOVEMBER 10, 2005—DECIDED MARCH 12, 2007

---

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case presents the question whether a foreign national who is not informed of his right to consular notification under Article 36 of the

---

[Œ] Defendants also filed a Petition for Rehearing En Banc, which was submitted to all judges in regular active service for a vote. No judge wished to rehear the case *en banc*, and thus that petition is denied. Circuit Judges Flaum and Williams took no part in the consideration or decision of the petition for rehearing *en banc*.

Vienna Convention on Consular Relations (Vienna Convention), Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261, has any individual remedy available to him in a U.S. court. This panel's original opinion in the case, *Jogi v. Voges*, 425 F.3d 367 (7th Cir. 2005), concluded that the answer was yes. The original opinion, to which we refer here as *Jogi I*, held that the district court had subject matter jurisdiction under both the general federal jurisdiction statute, 28 U.S.C. § 1331, and under the Alien Tort Statute (ATS), 28 U.S.C. § 1350. See 425 F.3d at 371-73. *Jogi I* also held that the Vienna Convention is a self-executing treaty, *id.* at 376-78; that Article 36 of the Convention confers an individual right to notification on nationals of parties to the treaty, *id.* at 378-84; and that the Convention itself gives rise to an implied individual private right of action for damages, *id.* at 384-85. Finally, *Jogi I* addressed several additional defenses that had been presented and concluded that none warranted dismissal.

Since *Jogi I* was decided, the Supreme Court has spoken on the subject of the Vienna Convention, albeit in the context of the availability of certain remedies in criminal proceedings and the applicability of the normal rules of procedural default. See *Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669 (2006). In addition, the Court has addressed the exclusionary rule, describing it as a remedial rule of "last resort," and its relation to the remedy provided by 42 U.S.C. § 1983 for police misconduct. See *Hudson v. Michigan*, 126 S.Ct. 2159, 2167-68 (2006). The Court's reference to § 1983 prompted us to request supplemental memoranda in Jogi's case addressing two questions: (1) whether it is necessary to rely on § 1350 for subject matter jurisdiction in a Vienna Convention case, given the existence of § 1331, and (2) whether § 1983 provides a private right of action here, rendering unnecessary our discussion of an implied action directly under the Convention. The

parties have submitted their memoranda, and we also have the benefit of an *amicus curiae* submission from the United States.

In the interest of avoiding a decision on grounds broader than are necessary to resolve the case, especially in an area that touches so directly on the foreign relations of the United States, the panel has re-examined its earlier opinion and has decided to withdraw that opinion and substitute the following one. Briefly put, we are persuaded that it is best not to rest subject matter jurisdiction on the ATS, since it is unclear whether the treaty violation Jogi has alleged amounts to a "tort." Both parties, as well as the United States, have suggested that jurisdiction is secure under 28 U.S.C. § 1331, and we agree with that position. Furthermore, rather than wade into the treacherous waters of implied remedies, we have concluded that Jogi's action rests on a more secure footing as one under 42 U.S.C. § 1983. At bottom, he is complaining about police action, under color of state law, that violates a right secured to him by a federal law (here, a treaty). We can safely leave for another day the question whether the Vienna Convention would directly support a private remedy.

# I

For convenience, we briefly recount the background facts of Jogi's case. Tejpaul S. Jogi is an Indian citizen who was charged with aggravated battery with a firearm in Champaign County, Illinois. Jogi pleaded guilty to the crime and served six years of a twelve-year sentence; at that point, he was removed from the United States and returned to India. No state official ever advised him of his right under the Vienna Convention to contact the Indian consulate for assistance, nor did any Champaign County

law enforcement official ever contact the Indian consulate on his or her own initiative on Jogi's behalf.

At some point after Jogi was in prison, he learned about the Vienna Convention. This prompted him to initiate several lawsuits, including the present case, in which he filed a *pro se* complaint seeking compensatory, nominal, and punitive damages to remedy this violation. He named as defendants various Champaign County law enforcement officials, including the two investigators who questioned him after his arrest. Jogi's complaint relied on the ATS, 28 U.S.C. § 1350, which establishes jurisdiction in the district courts over a civil action by an alien for a tort committed in violation of a treaty of the United States. See generally *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). The district court found that the state officials had violated the Vienna Convention, but it concluded that Jogi's allegations were insufficient to trigger subject matter jurisdiction under the ATS.

Jogi's appeal to this court followed, and, as we have recounted above, the panel in *Jogi I* concluded that the district court did have subject matter jurisdiction over the suit and that Jogi was entitled to proceed with his action. We expressed no opinion on a number of defenses that had not yet been raised, given the posture of the case, including the statute of limitations and qualified immunity. 425 F.3d at 386.

## II

### A

As before, the first issue we reach is that of subject matter jurisdiction. In the end, very little needs to be said on that point. Jogi's complaint makes it clear that he is attempting to assert rights under Article 36 of the Vienna Convention. The general federal jurisdiction statute, 28 U.S.C. § 1331, confers jurisdiction over claims arising

under the "Constitution, laws, or treaties of the United States." As everyone, including the United States, acknowledges, the assertion of a claim arising under any one of those sources of federal law is enough to support subject matter jurisdiction unless the claim is so plainly insubstantial that it does not engage the court's power. As the Supreme Court reaffirmed in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998):

> It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case. See generally 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350, p. 196, n. 8 and cases cited (2d ed. 1990). As we stated in *Bell v. Hood*, 327 U.S. 678, 682 . . . (1946), "[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Rather, the district court has jurisdiction if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another," *id.*, at 685, unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.*, at 682-683.

523 U.S. at 89. There can be no doubt that Jogi's claim does not fall within that small subset of utterly frivolous actions that are insufficient to support the court's jurisdiction.

We thus save for another day the question whether the ATS might also support subject matter jurisdiction in a case like Jogi's. The ATS, as the Supreme Court held in

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), grants jurisdiction to the federal courts to hear suits brought by aliens for torts either in violation of the law of nations or in violation of a treaty of the United States. We expressly refrain from deciding whether the failure of the police officers here to inform Jogi of the right to consular notification provided by Article 36 of the Vienna Convention was the kind of "tort . . . in violation of a treaty" that § 1350 covers. It is enough, for present purposes, that jurisdiction under § 1331 is secure.

## B

We now turn to the question whether 42 U.S.C. § 1983 provides the statutory right of action that Jogi needs for his claim. (The reason that the panel's opinion in *Jogi I* did not discuss this possibility is simple: the parties did not rely on § 1983. It is established, however, that complaints need not plead legal theories. Particularly with the benefit of the parties' supplemental memoranda on this point of law, we are free to consider it as a possible basis for the suit.) This well known statute says that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States *or other person* within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (Emphasis added.)

In *Maine v. Thiboutot*, 448 U.S. 1 (1980), the Supreme Court held that § 1983 encompasses claims based on purely statutory violations of federal law—there, violations of the federal Social Security Act. Or, as the Court put it more precisely, "[t]he question before us is whether the phrase 'and laws,' as used in § 1983, means what it says, or whether it should be limited to some subset of

laws." 448 U.S. at 4. After reviewing earlier cases and the legislative history of the Civil Rights Act of 1871, the Court resolved the question in favor of the straightforward reading: "laws" meant all laws.

The United States argues here, in its *amicus curiae* submission, that the word "laws" in § 1983 should be read to be restricted to statutes passed by Congress and to exclude treaties. This, it concedes, is a novel argument. There is nothing wrong with novelty *per se,* but this argument suffers from the disadvantage of being in tension with the Supreme Court's decision in *Baldwin v. Franks*, 120 U.S. 678 (1887), where the Court considered whether the criminal counterpart to what has become § 1983 (now codified at 18 U.S.C. §§ 241-42) supported a claim by a class of Chinese aliens that they had been deprived of their rights under certain treaties by a conspiracy of local officials. The Court decided that the statute did not reach that far, but for federalism reasons, not because "treaties" fell outside its scope. Indeed, it indicated that a proper claim under the treaty would be cognizable:

> The United States are bound by their treaty with China to exert their power to devise measures to secure the subjects of that government lawfully residing within the territory of the United States against ill treatment, and if in their efforts to carry the treaty into effect they had been forcibly opposed by persons who had conspired for that purpose, a state of things contemplated by the statute would have arisen. But that is not what Baldwin has done. His conspiracy is for the ill treatment itself, and not for hindering or delaying the United States in the execution of their measures to prevent it.

120 U.S. at 693-94.

Beyond that, the Supremacy Clause of the Constitution makes the "Constitution, and the Laws of the United States . . . and all Treaties made" the supreme law of the land. U.S. Const., art. VI, cl. 2. See also *Head Money Cases*, 112 U.S. 580, 598 (1884) ("[A] treaty may . . . contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law . . . ."). The government's concern that the inclusion of treaties as part of the law of the United States included in § 1983 would flood the courts with cases is overblown. As the government itself urges elsewhere in its filings before us, there are numerous hurdles that must be overcome before an individual may assert rights in a § 1983 case under a treaty: the treaty must be self-executing; it must contain provisions that provide rights to individuals rather than only to states; and the normal criteria for a § 1983 suit must be satisfied. Only a small subset of treaties, some assuring economic rights and others civil rights, would even be candidates for such a lawsuit. We are not persuaded that the addition of the words "and treaties" in statutes like § 1331 and 28 U.S.C. § 2241 (and the absence of those words in § 1983) compels a different result. Section 1983 is a statute that was designed to be a remedy "against all forms of official violation of federally protected rights," *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 700-01 (1978), when those violations are committed by state actors. To read it as excluding protection for the subset of treaties that provide individual rights would be to relegate treaties to second-class citizenship, in direct conflict with the Constitution's command. We conclude, therefore, that the fact that Jogi is asserting rights under a treaty does not in and of itself doom his case.

Before Jogi can proceed under § 1983, he must show two things: first, that a personal right can be inferred from Article 36 of the Vienna Convention; and second, that he is entitled to a private remedy. With respect to the first of those inquiries, the Supreme Court held in *Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002), that the same analysis applies to § 1983 cases as applies to other cases raising the question whether a private right exists. See 536 U.S. at 283-84. The *right,* it held, must appear unambiguously in either the statute or, as applied here, the treaty. For purposes of the inquiry into the existence of a legal right, the Court identified two relevant inquiries: (1) whether the statute by its terms grants private rights to any identifiable class; and (2) whether the text of the statute is phrased in terms of the persons benefitted. Before addressing those two questions, however, we consider it necessary to review the Vienna Convention in greater detail. Most of what follows appeared in *Jogi I.*

1. *The Vienna Convention and Article 36*

The Vienna Convention is a 79-article, multilateral treaty to which both the United States and India are signatories. The treaty covers topics such as consular relations in general; consular functions; facilities, privileges, and immunities of consular personnel; and communications with nationals of the sending state. The Preamble recalls that "consular relations have been established between peoples since ancient times," notes the principle of sovereign equality among states, recognizes the usefulness of a convention on this subject, and, importantly for our case, "realiz[es] that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States." Vienna Convention, pmbl.

Notwithstanding the latter paragraph of the Preamble, the Vienna Convention singles out individual rights in at least two places. The first is in the list of consular functions found in Article 5, which includes "helping and assisting nationals, both individuals and bodies corporate, of the sending State," Art. 5(e), and "representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State, for the purpose of obtaining, in accordance with the laws and regulations of the receiving State, provisional measures for the preservation of the rights and interests of these nationals, where, because of absence or any other reason, such nationals are unable at the proper time to assume the defence of their rights and interests," Art. 5(i).

The second, which is the critical one for Jogi, is Article 36, which reads as follows:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
>> (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>>
>> (b) *if he so requests*, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities*

*shall inform the person concerned without delay of his rights under this sub-paragraph*;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the *said laws and regulations must enable full effect* to be given to the purposes for which the rights accorded under this Article are intended.

Vienna Convention, Art. 36 (emphasis added). Among other requirements, this provision instructs authorities of a receiving state to notify an arrested foreign national of "his rights" under the Convention "without delay." *Id.* at ¶ 1(b).

There is an obvious tension between the broad language of the clause in the Preamble that appears to disclaim any general intent to protect individuals, and the language of Article 36. We address it in more detail below, when we consider whether the treaty confers a personal right on individuals like Jogi, but it is helpful here to set the stage for that discussion. One commentator has observed that of the Vienna Convention's 79 articles, the one with the "most tortuous and checkered background is indubitably Article 36." Luke Lee, Vienna Convention

on Consular Relations 107 (1966). The delegates to the Vienna Convention discussed and debated Article 36 extensively before it was finally approved. *Id.* at 107-14; 1 United Nations Conference on Consular Relations: Official Records, at 3, U.N. Doc. A/Conf. 2 5/6, U.N. Sales. No. 63.X.2 (1963).

The debates that took place as the Convention was being drafted reflect close attention to the question of the individual's right to consular notification. The district court's decision in *Standt v. City of New York*, 153 F.Supp. 2d 417 (S.D.N.Y. 2001), provides a useful summary of these discussions:

> [There was] widespread concern with the question of individual rights. For example, a proposed amendment by Venezuela that would have eliminated the individual right of consular communication was withdrawn after receiving strong opposition from other member states. 2 United Nations Conference on Consular Relations: Official Records, at 37, 38, 84, 85, 331-34, U.N. Doc. A/Conf. 2 5/6, U.N. Sales. No. 63.X.2 (1963) . . . . The United States, in particular, proposed language intended to "protect the rights of the national concerned." *Id.* at 337. In short, "the 'legislative history' of the Treaty supports the interpretation that Article 36 was intended to confer individual rights on foreign nationals." [Mark J.] Kadish, [*Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Counsel,*] 18 Mich. J. Int'l L. [565], at 599 [(1997)].

*Standt,* 153 F.Supp. 2d at 425-26.

The First Circuit had occasion to visit this issue in the case of *United States v. Li*, 206 F.3d 56 (1st Cir. 2000) (*en banc*), a case to which we return below. In an opinion concurring in part and dissenting in part, then-Chief Judge Torruella provided this helpful background:

The positions of the delegates from the United Kingdom and Australia were typical of the prevailing view. The former expressed his rejection of a proposal that a consul be notified only if the detained national so requested, because "[i]t could well make the provisions of Article 36 ineffective because the person arrested might not be aware of *his rights*." [Lee, Vienna Convention on Consular Relations] at 83-84 (emphasis supplied); *see also id.* at 339, 344. The Australian delegate stated along a similar vein, that "[t]here was no need to stress the extreme importance of not disregarding, in the present or any other international document, the *rights of the individual*." *Id.* at 331 (emphasis supplied). In fact the United States delegate proposed an amendment to Article 36(1)(b) that the notification to a consul of a national's detention be made at the request of the national, "to protect the *rights of the national concerned*." *Id.* at 337 (emphasis supplied). From these and other statements by the various national delegates there should be little doubt that the treaty under consideration concerned not only consular rights but also the separate individual rights of detained nationals . . . . [At this point the opinion gives specific references to the statements of delegates from 15 different countries.] [*S*]*ee also* Mark Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search For the Right to Counsel,* 18 Mich. J. Int'l L. 565 (1997) (discussing the Vienna Convention's history in this respect); *Report of the United States Delegation to the United Nations Conference on Consular Relations, Vienna, Austria, March 4 to April 22, 1963* (hereinafter "U.S. Vienna Report").

206 F.3d at 73-74. The ultimate amendment that became Article 36 was adopted by a margin of 65 votes to 2, with

12 abstentions. The United States delegate voted in favor of the amendment. *Id.* at 74.

Secretary of State William P. Rodgers indicated that Article 36 provided an individual right in his Letter of Transmittal, through which he officially submitted the certified copy of the Convention to the President. There he wrote that Article 36 "requires that authorities of the receiving State inform the person detained of *his right* to have the fact of his detention reported to the consular post concerned and of *his right* to communicate with that consular post." *Id.* (emphasis added). The U.S. Vienna Report explained that "[t]his provision has the virtue of setting out a requirement which is *not beyond means of practical implementation in the United States*, and, at the same, is useful to the consular service of the United States in the protection of our citizens abroad." *Id.* (emphasis added).

This is enough to give a sense of what Article 36 is about, and the two positions on its scope. Jogi argues that it confers an individual right on a person from the "sending" state to consular notification, while the defendants and the United States urge that it does no such thing, and that the notification process is for the convenience of the consular services and their respective governments. We return to this question below, when we consider whether such an individual right exists. In theory, we would also have to resolve the question whether the Convention is self-executing before proceeding, because if it is not, then Jogi's suit must fail for that reason alone. See *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985) (*per curiam*) (holding that if not implemented by enabling legislation, a treaty can provide a basis for a private lawsuit only if it is self-executing). Here, however, it is undisputed that the Convention is self-executing, meaning that legislative action was not necessary before it could be enforced. See generally Restatement

(Third) of the Foreign Relations Law of the United States § 111(4) (1987) (cited below as "Restatement Third"). We therefore dispense with that inquiry and move on to the issue that has generated the greatest degree of controversy: whether Article 36 confers individually enforceable rights.

### 2. *Individual Rights under the Treaty*

When the United States Senate gave its advice and consent to the ratification of the Vienna Convention in 1969, 115 Cong. 30997 (by a vote of 81 to 0), the Convention became the "supreme Law of the Land," binding on the states. U.S. Const., art. VI, cl. 2; see *Whitney v. Robertson,* 124 U.S. 190, 194 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation."); *Breard v. Greene*, 523 U.S. 371, 376 (1998) (*per curiam*) (stating that treaties are "on a full parity" with acts of Congress) (citing *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion)).

The Supreme Court has recognized that treaties, which are basically agreements among sovereign nations, may provide for individual rights. *United States v. Rauscher*, 119 U.S. 407 (1886) (holding that the provisions of an extradition treaty, permitting prosecution only for the crime on which extradition was based, could serve as a defense to the attempted prosecution of another crime); *United States v. Alvarez-Machain*, 504 U.S. 655, 664-70 (1992) (*Alvarez-Machain I*) (considering whether Alvarez's abduction violated the terms of an extradition treaty between the United States and Mexico); *Head Money Cases*, 112 U.S. at 598 (stating that "a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations" that "partake of the nature of municipal law, and which are capable of

enforcement as between private parties in the courts of the country").

In the case of the Vienna Convention, the Supreme Court has said, without finally deciding the point, that Article 36 "arguably confers on an individual the right to consular assistance following arrest." *Breard v. Greene*, 523 U.S. at 376; see also *Sanchez-Llamas,* 126 S.Ct. at 2677-78 (assuming, without deciding, that the Convention creates judicially enforceable rights). In *Breard v. Greene*, the Court faced facts that have become commonplace in Vienna Convention cases: a criminal defendant who was trying to use federal habeas corpus or other criminal proceedings to seek a remedy for a Convention violation based in the criminal law. 523 U.S. at 377 (finding that Breard had procedurally defaulted his Vienna Convention claim on habeas corpus review by failing to raise it in state court).

On analogous facts, this court and most of our sister circuits have refrained from deciding whether an individual right exists under the Vienna Convention; instead, most have concluded that the various *remedies* available to criminal defendants, such as the quashing of an indictment or the exclusionary rule, are not appropriate cures for a violation. See *Li*, 206 F.3d at 60 (1st Cir.) (*en banc*) ("We hold that irrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment."); *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) ("Even if we assume *arguendo* that De La Pava had judicially enforceable rights under the Vienna Convention—a position we do not adopt—the Government's failure to comply with the consular notification provision is not grounds for dismissal of the indictment."); *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (finding that "even if the

Vienna Convention on Consular Relations could be said to create individual rights" the defendant could not obtain habeas relief because his claim was procedurally defaulted); *United States v. Page*, 232 F.3d 536, 540 (6th Cir. 2000) (concluding that "although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36"); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 621 (7th Cir. 2000) ("It is sufficient for present purposes to assume that such an individual right is created by the Convention and to confront squarely whether the exclusionary rule is the appropriate sanction for a violation of that right."); *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000) (same); *United States v. Ortiz*, 315 F.3d 873, 886 (8th Cir. 2002) ("Even if we assume for present purposes that the Convention creates an individually enforceable right, it would not follow, on this record, that the statements should be excluded merely because the Convention has been violated."); *United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir. 2000) (*en banc*) (declining to decide whether Article 36 creates an individually enforceable right but concluding that suppression of evidence is an inappropriate remedy); *United States v. Minjares-Alvarez*, 264 F.3d 980, 986-87 (10th Cir. 2001) (declining to decide whether the Vienna Convention creates individually enforceable rights, but concluding that suppression is not an appropriate remedy); *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) (holding that a violation of the Vienna Convention does not warrant dismissal of an indictment); *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir. 2000) (*per curiam*) (same). Two circuits have found, in the context of a criminal proceeding, that the treaty does not confer individual rights. *United States v. Jimenez-Nava*, 243 F.3d 192, 197-98 (5th Cir. 2001); *United States v. Emuegbunam*, 268 F.3d 377, 391-94 (6th Cir. 2001).

This court is the first one to be confronted directly with the question whether the Convention creates a private right. *Lombera-Camorlinga*, 206 F.3d at 888 (noting that the court did "not decide whether a violation of Article 36 may be redressable by more common judicial remedies such as damages . . . "). The distinction between a private right, on the one hand, and various remedial measures that affect criminal prosecutions, on the other, is an important one, as the Supreme Court reiterated in *Hudson v. Michigan, supra.* The literature exploring the possibility of deterring unlawful police behavior through damages actions under 42 U.S.C. § 1983 or *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), makes the same point. See, *e.g.*, Harold J. Krent, *How to Move Beyond the Exclusionary Rule: Structuring Judicial Response to Legislative Reform Efforts,* 26 Pepp. L. Rev. 855 (1999); L. Timothy Perrin, *et al.*, *If It's Broken, Fix It: Moving Beyond the Exclusionary Rule*, 83 Iowa L. Rev. 669 (1998); Walter E. Dellinger, *Of Rights and Remedies: The Constitution as a Sword,* 85 Harv. L. Rev. 1532 (1972). Our consideration here of the question whether the Convention creates private rights is therefore in no way inconsistent with our conclusion in *Chaparro-Alcantara, supra,* that the exclusionary rule is not an available remedy for violations of the Vienna Convention.

As the Supreme Court in *Gonzaga University* counseled, we begin our inquiry with the text of Article 36. See 536 U.S. at 283-84. "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *Alvarez-Machain I,* 504 U.S. at 663; *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) ("Interpretation of [the Treaty] . . . must, of course, begin with the language of the Treaty itself [, and] [t]he clear import of Treaty language controls . . . ."); see also Vienna

Convention on the Law of Treaties (Treaty Convention), May 23, 1969, art. 26, 1155 U.N.T.S. 331, 339 (governing the interpretation of treaties and directing courts to look first to the plain language of a treaty when attempting to determine its meaning). Article 36 ¶ 1(b) states, plainly enough, that authorities "*shall* inform the person concerned without delay *of his rights* under this subparagraph." (Emphasis added). Justice O'Connor, noting this language, has observed that, "if a statute were to provide, for example, that arresting authorities 'shall inform a detained person without delay of his right to counsel,' I question whether more would be required before a defendant could invoke that statute to complain in court if he had not been so informed." *Medellin v. Dretke*, 544 U.S. 660, 687 (2005) (O'Connor, J., dissenting from dismissal of writ of *certiorari* as improvidently granted). A number of judges have noted that "the text emphasizes that the right of consular notice and assistance is the citizen's" and that this language is "mandatory and unequivocal." *Breard v. Pruett*, 134 F.3d 615, 622 (Butzner, S.J., concurring); see *Li,* 206 F.3d at 72 (Torruella, C.J., concurring in part, dissenting in part) ("I have some difficulty envisioning how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national, and that the failure to promptly notify him/her of these rights constitutes a violation of these entitlements by the detaining authority."); *United States v. Hongla-Yamche*, 55 F.Supp. 2d 74, 77 (D.Mass. 1999) ("The language of Article 36 clearly refers to the existence of an individual right.").

In our view, this text satisfies the strict test of clarity that the Supreme Court set forth in *Gonzaga University*. Faced with its unambiguous language, the defendants attempt to introduce doubt by looking at the Convention's Preamble, which we reproduced above. They place special weight on the fifth paragraph of the preamble, which says:

"Realizing that *the purpose of such privileges and immunities is not to benefit individuals* but to ensure the efficient performance of the functions by consular posts on behalf of their respective States . . . ." Vienna Convention, pmbl. (emphasis added). That statement is a perfectly good reflection of almost every other article of the Convention. It does not, however, describe Article 36. Indeed, there is little reason to think that it has any application at all to Article 36. We are inclined to agree with Jogi that the most reasonable understanding of this language is as a way of emphasizing that the Convention is not designed to benefit diplomats in their individual capacity, but rather to protect them in their official capacity. See *United States v. Rodrígues*, 68 F.Supp. 2d 178, 182 (E.D.N.Y. 1999) ("[I]t appears that the purpose of [the Preamble] is not to restrict the individual notification rights of foreign nationals, but to make clear that the Convention's purpose is to ensure the smooth functioning of consular posts in general, not to provide special treatment for individual consular officials."); Kadish, *supra,* 18 Mich. J. Int'l L. at 594 ("The privileges and immunities granted in the Vienna Convention are to enable the consul to perform his enumerated functions, not to benefit the consul personally. Thus, the preamble language refers to the individual consul, not individual foreign nationals.").

Whether or not we are reading the Preamble correctly, there is a broader principle at stake. It is a mistake to allow general language of a preamble to create an ambiguity in specific statutory or treaty text where none exists. Courts should look to materials like preambles and titles only if the text of the instrument is ambiguous. See, *e.g.*, *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 483 (2001) (inappropriate to look at title of section to create ambiguity if text is clear; the clear text "eliminates the interpretive role of the title, which may only shed light on some ambiguous word or phrase in the statute

itself"); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 290-91 (2000) (rejecting language of preamble of local ordinance as definitive for First Amendment challenge); *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 158 n. 13 (1982) (look to the preamble only for the administrative construction of the regulation, to which deference is due). See generally 2A Sutherland, Statutes and Statutory Construction § 47.04, at 146 (5th ed. 1992, Norman Singer ed.) ("The preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms.").

In *United States v. Stuart*, 489 U.S. 353 (1989), the Supreme Court stated that "a treaty should generally be construe[d] . . . liberally to give effect to the purpose which animates it and that [e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *Id.* at 368 (citation and internal quotation marks omitted); see *Asakura v. City of Seattle*, 265 U.S. 332, 342 (1924) ("Treaties are to be construed in a broad and liberal spirit, and, when two constructions are possible, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred.").

We conclude that even though many if not most parts of the Vienna Convention address only state-to-state matters, Article 36 confers individual rights on detained nationals. Although international treaties as a rule do not create individual rights, see *Chaparro-Alcantara*, 226 F.3d at 620-21, *Sosa* recognizes that international law in general, and thus treaties in particular, occasionally do so, see 124 S.Ct. at 2756. Although two of our sister circuits have issued opinions in which they apparently reject this conclusion, two considerations persuade us that we should not follow their lead: first, they were both addressing the specific argument that Article 36

provided some kind of shield against criminal enforcement—a position that we too have rejected—and second, these decisions both predated *Sosa.* See *Jimenez-Nava*, 243 F.3d at 198; *Emuegbunam*, 268 F.3d at 394.

Both the Fifth and the Sixth Circuits relied on the language of the Preamble, the fact that the State Department in a litigation context has taken the position that the Vienna Convention does not create individual rights, and the presumption against implied rights of action, in reaching their conclusions. We have already explained why we do not regard the Preamble as something capable of creating ambiguity in the otherwise plain language of Article 36. The negotiation history of Article 36 is filled with concern about the question of individual rights. For example, as the *Standt* court recalled:

> [A] proposed amendment by Venezuela that would have eliminated the individual right of consular communication was withdrawn after it received strong opposition from other member states. 2 United Nations Conference on Consular Relations: Official Records ["Official Records"], at 37, 38, 84, 85, 331-34, U.N. Doc. A/Conf. 2 5/6, U.N. Sales No. 63.X.2 (1963).

153 F.Supp. 2d at 425-26. The United States itself proposed language intended to "protect the rights of the national concerned." Official Records at 337; see *Li,* 206 F.3d at 73-74 (Torruella, C.J., concurring in part, dissenting in part).

It is also revealing that the regulations issued by the Department of Justice and (now) the Department of Homeland Security that address the subject of consular notification highlight the right of the individual alien to notification. See 28 C.F.R. § 50.5 (DOJ); 8 C.F.R. § 236.1(e) (DHS). The regulations in fact draw an interesting distinction between notifications: under the DOJ regulation, § 50.5(a)(1), the alien has the right to request the authori-

ties *not* to notify his or her home country, unless some other treaty takes that right away from him or her; the DHS regulation also acknowledges that particular treaties may require notification. By careful design, as the *travaux preparatoires* reveal, Article 36 of the Vienna Convention was worded in a way to ensure that only "if [the alien] so requests" would the receiving authorities of the state that had him in custody notify his home country's consular post. This indicates that the right conferred by Article 36 belongs to the individual, not to the respective governments.

The State Department sends regular notices to state and local officials reminding them of their notification obligations under the treaty. Kadish, *supra*, 18 Mich. J. Int'l L. at 599 & nn. 211-14 (citing *Breard v. Netherland*, 949 F.Supp. 1255 (E.D. Va. 1996)). The Foreign Affairs Manual issued by the State Department says that "Article 36 of the Vienna Consular Convention provides that the host government must notify the arrestee without delay of the arrestee's *right* to communicate with the American consul." (Emphasis added). Courts have observed that the United States has repeatedly invoked Article 36 on behalf of American citizens detained abroad who have not been granted the right of consular access. *United States v. Superville*, 40 F.Supp. 2d 672, 676 & n.3 (D.V.I. 1999) (noting United States interventions in Iran in 1979 and Nicaragua in 1986); see Gregory Dean Gisvold, *Strangers in a Strange Land: Assessing the Fate of Foreign Nationals Arrested in the United States by State and Local Authorities*, 78 Minn. L. Rev. 771, 792-94 (1994).

We conclude, for all these reasons, that Article 36 of the Vienna Convention by its terms grants private rights to an identifiable class of persons—aliens from countries that are parties to the Convention who are in the United States—and that its text is phrased in terms of the persons

benefitted. We thus turn to the final question, which is whether § 1983 furnishes a remedy to Jogi and other such aliens.

### 3.  *Remedy under 42 U.S.C. § 1983*

*Gonzaga University* drew a sharp distinction between the clarity required for finding a right and the burden of showing that a remedy is available under § 1983:

> Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. . . . Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.

536 U.S. at 284. Nothing in either the Vienna Convention or any other source of law has been presented to us that would rebut this presumption, apart from the argument we have rejected that treaties do not enjoy the same status as statutes. We therefore conclude that Jogi is entitled to pursue his claim under § 1983. We therefore have no need to reach the question addressed in *Jogi I* whether the Convention itself may be the source of an enforceable remedy.

### III

We close by reiterating our final conclusions from *Jogi I*. As we did there, we again reject the defendants' argument that Jogi's claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). It is not. *Heck* holds that a plaintiff seeking damages for an allegedly unconstitutional conviction or for other harm caused by actions whose unlawfulness would undermine the validity of the conviction "must

prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. at 486-87. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Court clarified the *Heck* rule. It explained that *Heck* prevents prisoners from making an end-run around the need to challenge the validity or duration of their convictions using the vehicle of habeas corpus, rather than through an action under 42 U.S.C. § 1983 or *Bivens*. If success in the lawsuit would not spell immediate or speedier relief, then § 1983 remains available for use, and *Heck* does not bar the action. *Id.* at 81-82.

The Supreme Court's recent decision in *Wallace v. Kato*, 127 S.Ct. 1091 (2007), makes it clear that *Heck* does not bar this action. *Wallace* is central, however, for one of the two issues that will certainly arise on remand: when exactly did Jogi's claim arise (a question of federal law, as *Wallace* held, 127 S.Ct. at 1095), and did he file suit in time? The statute of limitations is an affirmative defense, see FED. R. CIV. P. 8(c), and so this issue does not affect our decision about subject matter jurisdiction or Jogi's ability to state a claim. Since we have decided that this case must proceed under § 1983, it will be subject to the two-year statute of limitations that federal courts in Illinois borrow for these claims. (We note here that the *Wallace* Court looked to state law both for the basic statute of limitations and for any pertinent tolling rules. 127 S.Ct. at 1098-99. The district court will be free to explore the implications of this aspect of the Court's decision more fully on remand.) Relevant questions, assuming that the affirmative defense is raised properly, will include when Jogi's claim accrued, whether the discovery rule applies to his case, and whether he may take advantage of any tolling rules. Second, we think it inevitable that the issue

of qualified immunity—well established in § 1983 cases—will arise. Although normally we might be inclined to find waiver, because the defendants have not even whispered the phrase thus far, this is an unusual case. We leave it to the district court's sound discretion to decide whether to allow the defendants (who have not yet filed an answer, of course, because they won below on their motion under Rule 12(b)(1)) to raise this defense on remand.

The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

       Teste:

                    _____
                    *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*