In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3188

UCHE P. MORDI,

*Plaintiff-Appellee,*

*v.*

TODD ZEIGLER, GREG CHANCE, and
GREGG HEALEY,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 11-cv-0193-MJR-SCW— **Michael J. Reagan**, *Chief Judge.*

ARGUED SEPTEMBER 10, 2014 — DECIDED OCTOBER 29, 2014

Before WOOD, *Chief Judge,* and EASTERBROOK and TINDER,
*Circuit Judges.*

WOOD, *Chief Judge.* Although the United States has been a
party to the Vienna Convention on Consular Relations (Con-
vention) since December 24, 1969, see *Treaties in Force*, U.S.
DEP'T OF STATE (Jan. 1, 2013), http://www.state.gov/
s/l/treaty/tif/index.htm (all websites last accessed Oct. 29,
2014), questions about its obligations under the Convention

continue to arise. The Convention comprehensively regulates consular activities. See *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006). For the most part, it operates at the diplomatic level, but Article 36 of the Convention refers to the rights of a person from one State (the "sending" State) who finds himself arrested or detained in another State (the "receiving" State). In particular, the Convention requires the authorities of the receiving State to inform the foreign national of his right under Article 36 to have his own consular officials alerted to his arrest or detention. See Vienna Convention on Consular Relations, art. 36.1(b), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 [hereinafter Vienna Convention]. In the case before us, plaintiff Uche Phillip Mordi asserts that three Illinois state police officers (the Officers) failed to comply with this obligation, and he has sued them for damages under 42 U.S.C. § 1983. After the district court denied the Officers' motion for summary judgment, based in part on an assertion that they were entitled to qualified immunity, they brought this interlocutory appeal. We reject the Officers' broader arguments on appeal, but we agree with them that the specific legal principle on which this case turns was not clearly established, and so we reverse.

# I

At approximately 1:30 in the afternoon on March 12, 2009, Officer Todd Zeigler of the Illinois state police pulled over the vehicle that Mordi was driving. After a trained dog discovered drugs in the car, Zeigler arrested Mordi, took him to a police station, and left him in an interrogation room. Later that day, around 4:45 p.m., Officers Greg Chance and Gregg Healey interviewed Mordi. That evening, after 8:00 p.m., Zeigler took Mordi to the Effingham (Illinois)

County Jail, where other officers booked him. Mordi eventually pleaded guilty to charges of unlawful possession of a controlled substance, and he is currently in the Northeast Ohio Correctional Center, serving a sentence on that charge.

Mordi is a Nigerian national, and Nigeria has been a party to the Convention since 1968. See *Vienna Convention on Consular Relations*, UNITED NATIONS, https://treaties.un.org/Pages/ViewDetails.aspx?src=UNTSONLiNE&tabid=2&mtdsg_no=iii-6&chapter=3&lang=en. At the time Zeigler pulled him over, Mordi told Zeigler that his name was Nigerian, but Mordi does not recall whether he also mentioned that he was a Nigerian national. Zeigler did list Mordi's place of birth as Nigeria in a form he filled out the next day, but he asserts that he was unaware of Mordi's citizenship. (That is quite possible: as of 2010, the U.S. Census estimated that nearly 40 million foreign-born people, 17.5 million of whom are naturalized citizens, live in the United States. See *The Foreign-Born Population in the United States: 2010*, U.S. DEP'T OF COMMERCE (May 2012), www.census.gov/prod/2012pubs/acs-19.pdf.) Chance and Healey, however, did know about his citizenship because Mordi told them during the interview. Chance recorded on a form that Mordi was of Nigerian nationality and thus not a U.S. citizen.

After Mordi's arrest and detention at the jail, the Department of Homeland Security's Immigration and Customs Enforcement (ICE) filed a detainer notice with the sheriff. At the same time, the state began criminal proceedings in which it charged him with intent to distribute cocaine. Later, federal authorities took over the prosecution. Mordi was represented there by a federal public defender, who was aware of his nationality. He eventually pleaded guilty to possession of

a controlled substance with intent to distribute and was sentenced to 120 months' imprisonment. At no point during either the state or the federal criminal proceedings was he informed about his right under the Convention to have the Nigerian consulate notified about his status. He did not learn about the Convention until a year or so later, when another inmate at the Pennsylvania facility where he was incarcerated told him about it. At that point he wrote to the Nigerian consulate in Atlanta; it advised him to contact the New York office, but for unexplained reasons he did not follow through.

Mordi then briefly instituted *habeas corpus* proceedings, in which he argued that he had received ineffective assistance of counsel because his lawyer failed to inform him that after he served his federal sentence he would be removed to Nigeria and charged there for the same violation. He dismissed that petition, however. In 2011 he filed the present action under 42 U.S.C. § 1983. Although he initially named quite a few defendants, the district court granted summary judgment in favor of most of them. Only Zeigler, Chance, and Healey had their summary judgment motions denied. They have filed an interlocutory appeal in which they assert that they were entitled to qualified immunity. See *Behrens v. Pelletier*, 516 U.S. 299, 305–308 (1996) (collateral order jurisdiction supports immediate appeal from denial of qualified immunity where no issues of fact are involved). That question is properly before us, and so we turn now to it.

**II**

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court described the scope and purpose of the doctrine of qualified immunity in the following way:

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

*Id.* at 231 (internal quotation marks and citations omitted). See *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) ("Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'") (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011). Once a public official has raised a defense of qualified immunity, the plaintiff must establish two things in order to defeat the defense: first, that the facts alleged describe a violation of a protected right; and second, that this right was clearly established at the time of the defendant's alleged misconduct. *Id.* at 232.

The court cannot resolve disputed issues of fact when it addresses the first question because the ordinary rules governing summary judgment apply in that situation. See *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014); *Johnson v. Jones*,

515 U.S. 304, 313–14 (1995). With respect to the second question, the most important constraint relates to the appropriate level of generality. In *Anderson v. Creighton*, 483 U.S. 635 (1987), the Supreme Court observed that "if the test of 'clearly established law' were to be applied at [a very high] level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow* [*v. Fitzgerald*, 457 U.S. 800 (1982)]." *Anderson*, 483 U.S. at 639. Instead, it wrote, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. The Court reiterated the need to avoid overgenerality in *Plumhoff*, noting that the "crucial question" is "whether the official acted reasonably in the particular circumstances that he or she faced." 134 S. Ct. at 2023. See also *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).

The Officers devote a great deal of attention in their brief to the first of the two questions identified in *Pearson*: whether they violated any cognizable right that Mordi is entitled to assert. They concede that this court's opinion in *Jogi v. Voges*, 480 F.3d 822 (7th Cir. 2007) (*Jogi II)*, squarely supports an affirmative answer to that question (taking the alleged facts in Mordi's favor, as we must at this stage in order to have appellate jurisdiction). But, they urge, some of our sister circuits disagree with our conclusions in *Jogi* that Article 36 of the Convention is self-executing, see *id.* at 830, that it creates individually enforceable rights (though not a right to the remedy of suppression in a criminal case), see *id.* at 834, and that it may be enforced through an action under 42 U.S.C. § 1983. See *id.* at 836. *Cf., e.g., Mora v. New York*, 524 F.3d 183

(2d Cir. 2008) (Article 36.1(b) does not provide for individual rights that can be vindicated in an action under section 1983); *Gandara v. Bennett,* 528 F.3d 823 (11th Cir. 2008) (same); *Cornejo v. Cnty. of San Diego,* 504 F.3d 853 (9th Cir. 2007) (same).

These courts relied on arguments that we considered and rejected in *Jogi II.* We are not inclined to revisit our decision, which has not led to any parade of horribles in any of the three states in this circuit. It is notable that the Officers make no argument that the state in general is not required by Article 36 to provide the specified notification. That is understandable, in light of the U.S. Department of State's pamphlet entitled "Consular Notification and Access," which contains "[i]nstructions for Federal, State, and Local Law Enforcement and Other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them." *Consular Notification and Access*, U.S. DEP'T OF STATE (MAR. 2014), http://travel.state.gov/content/dam/travel/CNA trainingresources/CNAManual_Feb2014.pdf [hereinafter *Consular Notification and Access*]. (The Appendix to this opinion reproduces the summary page from the pamphlet that informs arresting officers what they must do to comply with Article 36.) The disagreement before us has to do with who bears that obligation and how that person (or those persons) must discharge it.

Another reason to decline the Officers' invitation to delve into the issues discussed in *Jogi II* is the fact that in this case it is unnecessary for us to do so. There was a time when lower courts were required to follow a prescribed sequence when they considered the two questions pertinent to qualified immunity, always deciding first if the alleged facts de-

scribed a legal violation, and only if they did, moving on to the question whether the law was clearly established. See *Saucier v. Katz,* 533 U.S. 194 (2001). The Court thought better of this requirement in *Pearson,* however, and it is now permissible to reach the second question first, if that is more efficient. See *Pearson*, 555 U.S. at 227. The present case, we conclude, is one that benefits from the flexibility afforded in *Pearson.* We thus move directly to the question whether Officers Zeigler, Chance, and Healey should have realized that, by failing to inform Mordi of his Article 36 rights, they were violating his rights.

The relevant part of Article 36 reads as follows:

> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this subparagraph ... .*

21 U.S.T. at 101–02 (emphasis added). It is enough for present purposes to focus on the italicized language. The third sentence of Article 36.1(b) anticipates the possibility that the arrested foreign national will not request consular notification for the simple reason that he does not know about his rights. The final sentence, using the mandatory word "shall,"

addresses that problem by placing a duty on the receiving State's authorities to inform the arrestee "without delay" of his Article 36 rights.

At a high level of generality, one might think that federal, state, and local officials all should know the laws of the United States, including its treaties, and thus all should be held accountable if they fail to discharge "known" duties like this one. But the Supreme Court has told us that this is not the correct perspective. Instead, for purposes of the present case, we must ask at least the following more specific questions: (1) does Article 36 impose a duty on an arresting officer like Zeigler to ascertain nationality at the moment of arrest; (2) does it require an arresting officer like Zeigler to notify the arrestee of possible Convention rights before it is necessary to give *Miranda* warnings, or before he knows whether the arrestee is from a Convention country; (3) does the treaty require an Article 36 notification prior to booking, by any and all officers who have contact with the arrestee; and (4) does the treaty require notification before an interview can take place? A common theme runs through these questions: what does it mean to inform someone "without delay"? A second general issue relates to personal responsibility. The Supreme Court has repeatedly held that section 1983 "will not support a claim based on a *respondeat superior* theory of liability." *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); see *Ashcroft v. Iqbal,* 556 U.S. 662, 675–76 (2009) (applying same principle to actions against the federal government under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971)). Do Convention responsibilities attach to persons like the Officers here, who simply arrested, transported, and briefly interrogated the suspect? If so, then liability is at least possible; but if not, then these de-

fendants cannot be held vicariously responsible for the fail-
ure of another party (perhaps the booking officer or the ar-
raigning magistrate) to convey the required information.

Existing opinions do not offer much guidance on the an-
swers to the questions we just posed. It appears, however,
that "without delay" does not mean "instantly." In *Medellín
v. Texas*, 552 U.S. 491 (2008) (*Medellín I*), the Supreme Court
observed that the International Court of Justice has found
that the obligation to notify "without delay" is satisfied
where notice is provided within three working days. *Id.* at
502 n.1 (citing *Case Concerning Avena and Other Mexican Na-
tionals* (Mex. v. U.S.), 2004 I.C.J. 12, 52 ¶ 97 (Judgment of
Mar. 31)). The Court had no need in *Medellín I* to adopt that
rule, but neither did the Court disapprove it. The Virginia
Supreme Court also has held that lack of notification 36
hours after an arrest does not violate the Convention. *Bell v.
Commonwealth*, 563 S.E.2d 695, 706 (Va. 2002); see also
*Sanchez-Llamas*, 548 U.S. at 362 (Ginsburg, J., concurring)
(Convention does not require officials "to contact the consu-
lar post instantly"); *United States v. Ortiz*, 315 F.3d 873, 887
(8th Cir. 2002) (Convention does not require that interroga-
tion cease until consular contact is made). The State Depart-
ment's consular notification and access pamphlet states that
notification should occur "by or at the time the foreign na-
tional is booked," *Consular Notification and Access*, at 21,
while a directive from the Illinois State Police says that offic-
ers must notify foreign nationals "promptly" of their right to
consular notification. ILLINOIS STATE POLICE, DIRECTIVE ENF-
031 FOREIGN NATIONALS 2 (Jan. 15, 2007).

It is impossible, in light of all this, to say that the law that
Officer Zeigler faced was "clearly established" such that he

should have known that he had a personal duty to ascertain Mordi's citizenship and then to notify Mordi about his right to consular notification under Article 36 of the Convention at the moment of arrest, or at least by the time he delivered Mordi to the police station and left him in the interrogation room. At most, three hours and fifteen minutes elapsed between the arrest (1:30 p.m.) and the beginning of interrogation (4:45 p.m.). Later, some time after 8:00 p.m., Zeigler drove Mordi to the jail, where other officers booked him. Once again, there is no clearly established law that should have alerted Zeigler to the existence of a personal responsibility to notify Mordi at that stage about his Article 36 rights. (Indeed, we leave open the question whether an officer in Zeigler's position, whose involvement was limited to arrest and transportation, ever had any duty under Article 36; it is unnecessary for us to resolve that issue today.)

Officers Chance and Healey's role was different, but the bottom line is the same. They interviewed Mordi at the police station, before Zeigler moved him to the Effingham County Jail. Mordi told them that he was a Nigerian citizen, but that was all. If they began interviewing Mordi at 4:45 p.m. and Mordi left the jail around 8:00 p.m., their encounter was a little more than three hours (if they talked the whole time), and they were finished with him less than eight hours after the arrest. They were not responsible for booking him. As far as they knew, he was no longer their responsibility the minute Zeigler took over and drove him to the Jail. No clearly established rule that we can find should have made it clear to them that they were the officers charged with consular notifications.

Perhaps, as the materials from the State Department included in the Appendix to this opinion might suggest, it would be desirable to impose a duty to notify on every law enforcement officer who encounters a possible non-U.S. citizen. But it is possible that such a rule would lead to substantial duplication of effort and confusion in the consular services. One officer might call the Chicago office of a particular country; another might call the St. Louis office; a third might call Washington, D.C. If Mordi had sued the booking officers, we might need to consider this question in greater detail, but they are no longer in the case. The interpretation and implementation of the Convention touch on the diplomatic relations of the United States, and so we think it prudent to tread carefully here. All we need to say to resolve this case is that the details of how to implement the Article 36 duty to inform the arrestee of his rights without delay have yet to be fixed. There is no clearly established law that the three Officers before us violated, and thus they are entitled to qualified immunity from suit.

We therefore REVERSE the order of the district court denying qualified immunity and REMAND with instructions to dismiss the action.

# Appendix

## ARRESTING A NON-U.S. CITIZEN
### Consular Notification Process



**Q.** Are you a U.S. citizen?

**A.** "**YES,** I am a U.S. citizen."
(No further action required.) STOP

"**NO,** I am not a U.S. citizen."
NEXT

**Q.** Are you a national of one of these countries?

Albania
Algeria
Antigua and Barbuda
Armenia
Azerbaijan
Bahamas
Barbados
Belarus
Belize
Brunei
Bulgaria
China [1]

Costa Rica
Cyprus
Czech Republic
Dominica
Fiji
Gambia
Georgia
Ghana
Grenada
Guyana
Hungary
Jamaica

Kazakhstan
Kiribati
Kuwait
Kyrgyzstan
Malaysia
Malta
Mauritius
Moldova
Mongolia
Nigeria
Philippines

Poland [2]
Romania
Russia
St. Kitts and Nevis
St. Lucia
St. Vincent and the Grenadines
Seychelles
Sierra Leone
Singapore
Slovakia
Tajikistan

Tanzania
Tonga
Trinidad and Tobago
Tunisia
Turkmenistan
Tuvalu
Ukraine
United Kingdom [3]
Uzbekistan
Zambia
Zimbabwe

1. Includes Hong Kong and Macao. Does not include Republic of China (Taiwan).
2. Mandatory only for non-permanent residents in the United States (i.e., those not holding a "green card"); for green card holders, notification is upon request.
3. UK includes Anguilla, British Virgin Islands, Bermuda, Montserrat, and the Turks and Caicos Islands. Residents' passports bear the name of their territory and may also bear the name "United Kingdom." Whether or not the passport bears the name "United Kingdom," consular services for these persons are provided by UK consulates.

**A.** "**YES.**"

**Step 1.** Inform detainee that he or she may communicate with consulate, and that you must notify consulate of arrest/detention.

**Step 2.** Notify nearest consulate **without delay**.

**Step 3.** Make record of notification in case file. Where fax or email sent, keep fax confirmation or sent email.

**Step 4.** Allow consular officers access to detainee if they subsequently request access.

(No further action required.) STOP

"**NO.**"

Inform detainee, **without delay**, that he or she may have consulate notified of arrest/detention.

NEXT

**Q.** Do you want your consulate notified of your arrest/detention?

**A.** "**YES.**"

**Step 1.** Make note in case file.

**Step 2.** Notify nearest consulate **without delay**.

**Step 3.** Make record of notification in case file. Where fax or email sent, keep fax confirmation or sent email.

**Step 4.** Allow consular officers access to detainee if they subsequently request access.

(No further action required.) STOP

"**NO.**"

**Step 1.** Make note in case file.

**Step 2.** Do **NOT** inform the consulate.

(No further action required.) STOP

**IN ALL CASES:**

- Do not inform consulate about detainee's refugee or asylum status.

- Detainee may communicate with consular officer and may request consular access at any time (whether previously declined or not).

- Consular officers may have access to detainee regardless of whether detainee requests it. Even if detainee does not want to be visited, consular officers may still have one face-to-face visit.

Consular Notification & Access (CNA)
U.S. Department of State
CA/P
SA-17, 12th Floor
Washington, DC 20522-1712

P: 202-485-7703
F: 202-485-6170
consnot@state.gov

For more information visit: *http://travel.state.gov/CNA*