In the

# United States Court of Appeals
### For the Seventh Circuit

No. 14-1746

PATRICK J. WERNER,

*Plaintiff-Appellant,*

*v.*

EDWARD F. WALL, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:12-cv-00096-CNC — **Charles N. Clevert, Jr.**, *Judge.*

ARGUED APRIL 6, 2016 — DECIDED SEPTEMBER 1, 2016

Before FLAUM, RIPPLE, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In 1999, Patrick Werner was convicted of multiple sex offenses in Wisconsin state court. The state trial court sentenced him to ten years of imprisonment and to ten consecutive years of probation. Because Mr. Werner had been convicted of more than one sex offense, he was a Special Bulletin Notification ("SBN") sex offender under Wisconsin law. After a denial of parole in late 2009, Mr. Werner's release was deferred until his mandatory release date of

March 21, 2010. At that time, Mr. Werner and his probation agents were unable to secure an approved residence as required by his rules of supervision. Consequently, the Wisconsin Department of Corrections ("DOC") Division of Community Corrections detained him pursuant to Administrative Directive No. 02-10 ("AD 02-10" or "the directive"), which set out a procedure addressing release-eligible SBN sex offenders who lacked an approved residence. Under AD 02-10, persons who had reached their mandatory release date but could not secure housing that was approved under their rules of supervision were detained in the county jail during the night but permitted to seek appropriate housing during certain hours of the day. Authorities employed this arrangement to prevent a violation of the rules of supervision. Officials detained Mr. Werner under this arrangement sporadically between March 16, 2010, and July 1, 2011, when he finally located and moved into an approved residence.

Mr. Werner brought this action pro se in the district court under 42 U.S.C. § 1983. He claimed that his continued detention beyond his mandatory release date was unlawful and named as defendants various DOC officials and several of his probation agents. In an initial screening order, the district court permitted Mr. Werner to proceed on the individual-capacity claims under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. It also permitted him to maintain an official-capacity claim for injunctive relief on the ground that AD 02-10 violated the Due Process and Ex Post Facto Clauses. The district court ultimately granted summary judgment in favor of the defendants on all of Mr. Werner's claims. It concluded that his Eighth and Fourteenth Amendment claims were barred by qualified immunity and that his official capacity challenge to the directive as a policy

was moot. Mr. Werner timely appealed the district court's decision with respect to his individual-capacity claims. In due course, we recruited counsel and requested additional briefing.

After the benefit of briefing and oral argument, we agree with the district court that the defendants in this case are entitled to qualified immunity. We therefore affirm the district court's judgment with respect to each of Mr. Werner's claims.

# I

## BACKGROUND

### A.

In 1999, the Circuit Court of Brown County, Wisconsin, convicted Mr. Werner of second-degree sexual assault of a child and of attempted child enticement. The court sentenced him to ten years in prison with ten consecutive years of probation. After his parole was denied in late 2009, Mr. Werner's release was deferred until his mandatory release date of March 21, 2010. Wisconsin law requires that any person convicted of a sex offense and then released to parole or extended supervision be placed initially in the county where the person resided on the date of the offense, the county where the person was convicted, or a sex offender treatment facility. Wis. Stat. § 301.03(20)(a). Mr. Werner was convicted in Brown County, and the Division of Community Corrections sought

to place him there.[1] Because of Mr. Werner's multiple sex of-
fense convictions, he also was designated an SBN sex of-
fender. This designation required the Division of Community
Corrections to provide notice of his placement in Brown
County to law enforcement officials in that community. *See id.*
§ 301.46(2m)(am).

Wisconsin law provided still more restrictions. At the time
of Mr. Werner's mandatory release date in 2010, the rules of
supervision for all sex offenders required them to obtain and
to maintain an approved residence; they were not permitted
to be homeless because of the risk of recidivism. Mr. Werner's
Standard Sex Offender Rules consequently provided, in rele-
vant part:

> 5. You shall not reside nor "stay" overnight in
> any place other than a pre-approved residence
> without prior agent approval. "Overnight" is
> defined as the daily period of time between the
> hours of 8 p.m. and 8 a.m. unless redefined by
> your agent in advance.
>
> …

---

[1] Although the statute provides multiple placement options, *see* Wis. Stat.
§ 301.03(20)(a), the record indicates, and the district court found, that the
Division of Community Corrections *had to* place Mr. Werner in Brown
County, the county of his conviction. It is not clear why this was the case.
However, Mr. Werner does not argue that he could have been released
somewhere other than Brown County.

> 11. You shall fully comply with all sex offender registry requirements as applicable and directed by your agent and/or required by statute.[2]

SBN sex offenders in particular were required to "provide a specific, verifiable address prior to release from a correctional institution … subject to the department's approval."[3] In determining whether to approve a proposed residence, agents were required to consider, among other things, the "[p]roximity to the SBN offender's victim(s), elementary or secondary schools, parks and licensed or certified day care providers."[4]

There were still more restrictions, imposed by a combination of department rules and community ordinances. Among the thirty-nine Rules of Community Supervision, the first stated:

> 1. You shall avoid all conduct which is in violation of federal or state statute, municipal or county ordinances, tribal law or which is not in the best interest of the public welfare or your rehabilitation.[5]

---

[2] R.90-3.

[3] R.93-2 at 1.

[4] *Id.*

[5] R.90-2 at 1.

Brown County had over a dozen ordinances in place that restricted where registered sex offenders could reside.[6] Both the Standard Sex Offender Rules and the Rules of Community Supervision provided that a violation of any rule would subject the offender to possible revocation of his or her probation, parole, or extended supervision. Therefore, residing in any place forbidden by local ordinance constituted a violation of these rules and subjected Mr. Werner to possible revocation of his probation.

Wisconsin authorities had wrestled with the problem created by the confluence of these provisions for quite a while before Mr. Werner's situation came to the fore. In 2002, nearly a decade before Mr. Werner's mandatory release date, the Division of Community Corrections had fashioned an administrative scheme to address this dilemma in releasing convicted sex offenders to communities with restrictive sex offender ordinances. Responding to several Wisconsin Court of Appeals decisions requiring that sex offenders be released on their mandatory release date regardless of whether they had approved housing, the Division of Community Corrections promulgated AD 02-10, which detailed the department's "Procedures for SBN Offenders Lacking Approved Residences."[7] Relying explicitly on the DOC's existing authority to "take[] into custody and detain[]" an offender on supervised release "[t]o prevent a possible violation," Wis. Admin.

---

[6] During the summary judgment stage in the district court, the defendants submitted a document containing a very general description of these ordinances. *See* R.93-1.

[7] R.93-2 at 1.

Code DOC § 328.22(2)(d) (2002),[8] AD 02–10 set out the following:

> Approved Residence Requirement
>
> An approved residence is a standard requirement of supervision for all sex offenders. Special Bulletin Notification (SBN) offenders must provide a specific, verifiable address prior to release from a correctional institution. The proposed residence is subject to the department's approval. …
>
> …
>
> Lack of Approved Residence After Release
>
> Wisconsin law requires the Department of Corrections to release offenders on their mandatory release dates. The decisions of the Court of Appeals in *State ex rel. Woods v. Morgan*, 224 Wis 2d, 534, 591 N.W.2d 922 (Ct. App. 1999) and *State ex rel. Olson v. Litscher*, 233 Wis.2d 685, 608, N.W.2d 425 (Ct. App. 2000) require that prisoners be released upon reaching mandatory release, whether or not an approved residence has been found.
>
> If, upon release, a SBN offender does not have a residence, which the department has approved, the offender shall be directed to secure an approved residence by the end of the workday.

---

[8] This provision is now located at Wisconsin Administrative Code DOC § 328.27(2)(d).

**The SBN offender shall be permitted to conduct an "unfettered" search for housing.** This means the SBN offender shall be permitted to leave the presence of DOC staff to search for housing. In order to accomplish this, the agent shall require the SBN offender to be accompanied by an approved chaperone. The SBN offender shall also be required to provide an itinerary, prior to leaving the agent's presence, and to keep a log of movements, appointments and personal contacts. The SBN offender shall wear an [electromagnetic pulse ("EMP")] transmitter at all times. The chaperone shall be provided with a cellular phone and an EMP "scanner."

The SBN offender is not required to remain in the physical presence of the chaperone at all times during the search for housing. However, the SBN offender will be required to remain within range of the EMP scanner. The chaperone must also be provided a copy of the SBN offender's rules and must agree to neither assist nor encourage the SBN offender to violate any rule. The chaperone will have no authority to detain or impede the SBN offender.

If the SBN offender does not secure an approved residence by 5:00 p.m. **and the department has no alternative housing resources in the community of release,** the SBN offender may be detained in the county jail, to prevent a violation, pursuant to Wis. Admin. Code DOC 328.22(2)(d). The SBN offender shall be released

from custody the next workday, to continue to search for an approved residence. The requirements for the search remain the same: EMP, provide a written itinerary, keep a log of movements and be accompanied by an approved chaperone. If any requirement is unmet, the SBN offender shall remain in custody, until all requirements can be met.

…

Procedures Upon Locating Residence

When an appropriate residence has been located, the agent will notify local law enforcement, who shall have the opportunity to notify the community before the SBN offender establishes residence.[9]

**B.**

Mr. Werner was assigned three different probation agents during the time period he was under the supervision of the Division of Community Corrections. Although he was still incarcerated, Agent Amanda Martin received Mr. Werner's file on November 12, 2009, the day before his parole was denied and his release deferred. On December 1, 2009, Agent Martin discussed with Mr. Werner his housing and employment options. She described Brown County's sex offender ordinances, the procedures set out in AD 02-10 should he be unable to secure an approved residence before his mandatory release

---

[9] R.93-2 at 1–2 (emphases in original).

date, and the global positioning satellite ("GPS") tracker that Mr. Werner would be required to carry on release. Over the next several months, while Mr. Werner still was incarcerated, Agent Martin investigated numerous potential residences proposed by Mr. Werner, his social worker, and his mother; however, she determined that she could not approve any of these proposed residences. Agent Martin also arranged a chaperone, pursuant to AD 02-10, with whom Mr. Werner could search for housing for four hours per weekday.

On March 4, 2010, Agent Martin and her supervisor, Lori Richgels, met with law enforcement officials to discuss Mr. Werner's release plan and to determine the appropriate level of community notification. On March 16, 2010, five days before his mandatory release date, Mr. Werner was transferred from a state penitentiary to the Division of Community Corrections office in Green Bay. Agent Martin completed the intake process with Mr. Werner, which included reviewing the process for mandatory GPS monitoring, the sex offender registry requirements, and the procedure for sex offender housing searches. Mr. Werner reviewed and signed his Rules of Community Supervision and Standard Sex Offender Rules, as well as paperwork concerning the chaperone service. Because Mr. Werner had not secured an approved residence and the department had no alternative housing resources in the community, AD 02-10 applied and Mr. Werner was booked into the Brown County Jail to prevent a probation violation. For the next several months, Mr. Werner, with the assistance of Agent Martin, sought appropriate housing under the procedures outlined in AD 02–10.

In October 2010, Mr. Werner violated his supervision rules by possessing contraband and making threatening comments

to his pod mates at the Brown County Jail. He agreed to an Alternative to Revocation ("ATR"), under which he would spend ninety days at a state penitentiary; he began serving the ATR on December 1, 2010. Soon after, Agent Robert Fusfeld replaced Agent Martin as Mr. Werner's probation agent. Mr. Werner was released back to the Division of Community Corrections office in Green Bay on March 1, 2011. For the next several months, he continued to search for approvable housing under AD 02-10. On June 1, 2011, Mr. Werner located a tentative residence in Bellevue, Wisconsin. Agent Fusfeld investigated the residence, approved it, and began arrangements for Mr. Werner's release.

On June 22, 2011, Agent Erin Murto replaced Agent Fusfeld; she continued to arrange for Mr. Werner to move into the residence in Bellevue that Agent Fusfeld had approved. Mr. Werner moved into the residence on July 1, 2011. However, in November 2011, Mr. Werner again violated the terms of his supervision. His probation was revoked on April 23, 2012, and he was ordered by an Administrative Law Judge ("ALJ") to return to prison for two years, four months, and three days.[10]

On November 16, 2012, Mr. Werner again was released, this time to a transitional living program in Green Bay.[11] On

_____

[10] *See* Wis. Admin. Code HA § 2.05 (outlining Wisconsin's revocation process).

[11] According to the record, Mr. Werner had requested initially that he be placed at the transitional living program in Green Bay upon his mandatory release date in March 2010. At the time, however, the transitional living program was too close to a park under the applicable sex offender or-

February 15, 2013, however, Mr. Werner violated the rules of his supervision by, among other things, sending a sexually explicit message to a sixteen-year-old girl. According to the State, Mr. Werner's probation was revoked, and he is currently incarcerated at a state penitentiary. The parties also inform us that AD 02-10 was replaced in March 2015 by AD 15-12, under which SBN sex offenders lacking approved residences are no longer held in jail until they can secure an approved residence.

## C.

On January 31, 2012, Mr. Werner brought this action pro se in the United States District Court for the Eastern District of Wisconsin under 42 U.S.C. § 1983, alleging that he was unlawfully detained from March 16, 2010, until July 1, 2011.[12]

---

dinance. Mr. Werner requested an exemption from the Green Bay Sex Offender Residence Board but was denied. In August 2012, Green Bay revised its ordinance to permit sex offenders to move directly to a transitional living program without the Board's prior approval. This cleared the way for Mr. Werner to be placed there in November 2012, which took him out of the purview of AD 02-10.

[12] As our recitation of the facts makes clear, large portions of Mr. Werner's detention over this period of time were authorized independently of AD 02-10. For example, when Mr. Werner violated his terms of supervision in October 2010, the DOC's authority to detain him would have derived either from Wisconsin Administrative Code DOC § 328.22(2)(a), which permits detention "[f]or investigation of an alleged violation," or from DOC § 328.22(2)(b), which permits detention "[a]fter an alleged violation … to determine whether to commence revocation proceedings." Mr. Werner also served a ninety-day Alternative to Revocation sentence from December 1, 2010, until March 1, 2011. Because we hold that the defendants in

Mr. Werner sought monetary damages and injunctive relief. He named as individual defendants: DOC Secretary Gary Hamblin; Division of Community Corrections Regional Chief Rose Snyder-Spaar; Division of Community Corrections Administrator Denise Symdon; Division of Community Corrections Field Supervisors Thomas Wickeham and Lori Richgels; and Agents Martin, Fusfeld, and Murto (collectively, "the defendants").

In a screening order, the district court allowed Mr. Werner's Eighth Amendment and due process claims, based on his continued detention beyond his mandatory release date, to proceed against Agents Martin, Fusfeld, and Murto, and Supervisors Wickeham and Richgels. The district court also allowed him to go forward with official-capacity claims for injunctive relief against all of the named defendants[13] on the ground that AD 02-10 violated the Due Process and Ex Post Facto Clauses of the Constitution. The defendants moved for summary judgment on each of these claims. Mr. Werner also moved for summary judgment, but the district court denied his motion on procedural grounds. Several months later, Mr. Werner filed a number of documents that the court ultimately construed as a motion for summary judgment and a response in opposition to the defendants' motion.

---

this case are shielded from civil liability, we need not determine precisely the time period that Mr. Werner was held under the challenged directive.

[13] On October 27, 2012, Edward Wall succeeded Hamblin as DOC Secretary. Because Mr. Werner had sued Hamblin, a public officer, in his official capacity, the district court granted the defendants' motion to substitute Secretary Wall as a party under Federal Rule of Civil Procedure 25(d). R.119 at 1.

On March 27, 2014, the district court granted summary judgment in favor of the defendants. The court concluded that Mr. Werner's Eighth Amendment and due process claims for damages against the individual defendants were barred by qualified immunity because it was not clearly established at the time that AD 02-10 violated the constitutional rights of SBN sex offenders. It further held that Mr. Werner's official-capacity claims that AD 02-10 was unconstitutional were moot because he no longer was subject to the directive.

Acting pro se, Mr. Werner timely appealed the court's judgment, and we recruited counsel to assist him.[14] We ordered the parties to address at least the following issues:

> (1) Do the facts alleged by Werner (including his detention in county jail beyond his release date) state a claim under the Eighth Amendment or the Due Process Clause of the Fourteenth Amendment?

> (2) If Werner has stated a constitutional claim for damages, are the defendants entitled to qualified immunity for detaining Werner in county jail after his release date?[15]

---

[14] The court expresses its appreciation to counsel and his law firm for their excellent representation of their client.

[15] Dkt.52.

## II

## DISCUSSION

The district court granted summary judgment on Mr. Werner's Eighth Amendment[16] and due process claims because it concluded that the defendants were entitled to the protections of qualified immunity.[17] "We review a district court's grant of summary judgment based on qualified immunity *de novo*, accepting all facts and inferences in the light most favorable to the non-moving party." *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015). Qualified immunity shields government officials from civil "liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether qualified immunity applies, "we must address two questions: [1] whether the plaintiff's allegations make out a deprivation of a constitutional right, and [2] whether the right was clearly established at the time of defendant's alleged misconduct." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At one time, the Supreme Court required categorically that we conduct these two inquiries sequentially in order to avoid stagnation in the development of constitutional law. *See*

---

[16] The Eighth Amendment applies here to Wisconsin through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666 (1962).

[17] Mr. Werner concedes that his official-capacity claims for injunctive relief on the ground that AD 02-10 as a policy is unconstitutional are now moot because the directive is no longer in effect. We therefore do not address them. Mr. Werner's individual claims for damages, of course, are not affected by this development.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under this framework, we had to determine "first if the alleged facts described a legal violation, and only if they did, mov[e] on to the question whether the law was clearly established." *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014). The Court relaxed this "rigid order of battle" in *Pearson v. Callahan*, 555 U.S. 223 (2009). It held that "the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.[18]

In some situations, adherence to the traditional two-step approach is appropriate. *See id.* (recognizing that it is "often beneficial" to follow "the *Saucier* protocol"). Nevertheless, the circumstances of the present case make it advisable to avail ourselves of the latitude now afforded us. *Id.* at 241 ("Adherence to *Saucier*'s two-step protocol departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." (alteration omitted) (internal quotation marks omitted)).[19] Indeed, there are several reasons that counsel that we not address definitively the constitutional issue. First, the underlying adminis-

---

[18] *See also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (exercising this discretion); *City and Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (same); *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014) (same).

[19] *See also Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) ("[*Pearson*'s] approach comports with our usual reluctance to decide constitutional questions unnecessarily.").

trative directive is no longer operable. Secondly, the appropriate analysis for claims of detained individuals not subject to sentences of incarceration is a difficult question, and it is easy for an intermediate appellate tribunal to lose its footing on the shifting sands of present-day case authority. For a long time, we have recognized that the treatment of a detained person not serving a sentence of incarceration is governed by the Due Process Clause,[20] but we often have borrowed Eighth Amendment standards as a rule of decision.[21] We also have recognized, of course, that a person serving a sentence of probation or parole has a limited liberty interest in his freedom that cannot be curtailed without the procedural protections of notice and hearing. *See Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Yet, when confronted with the failure to release a person because of an error in the computation of his sentence, we have relied on

---

[20] *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012) (holding that "[b]ecause Rice was a pretrial detainee, it is the due process clause of the Fourteenth Amendment rather than the Eighth Amendment's proscription against cruel and unusual punishment which is the source of [his] right"); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[C]onditions or restrictions of pretrial detention … implicate only the protection against deprivation of liberty without due process of law.").

[21] *See Rice*, 675 F.3d at 664 (noting that "courts still look to Eighth Amendment case law in addressing the claims of pretrial detainees, given that the protections of the Fourteenth Amendment's due process clause are at least as broad as those that the Eighth Amendment affords to convicted prisoners, and the Supreme Court has not yet determined just how much additional protection the Fourteenth Amendment gives to pretrial detainees" (citations omitted)).

the principles of the Eighth Amendment. *See Campbell v. Peters*, 256 F.3d 695 (7th Cir. 2001);[22] *Burke v. Johnston*, 452 F.3d 665 (7th Cir. 2006).[23] *But cf. Armato v. Grounds*, 766 F.3d 713 (7th Cir. 2014) (analyzing a similar problem under both

---

[22] In *Campbell v. Peters*, 256 F.3d 695 (7th Cir. 2001), Campbell had been convicted of residential burglary and sentenced to a prison term and a consecutive term of mandatory supervised release ("MSR"). *Id.* at 697. While serving the MSR term, Campbell was arrested and convicted of unlawful use of a weapon by a felon and sentenced to a two-year prison term; his burglary MSR was revoked. *Id.* Upon returning to prison, Campbell committed several offenses that resulted in revocation of the good conduct credits he had earned while serving his burglary prison term. *Id.* at 697–98. When Campbell eventually was released, he filed a § 1983 action claiming that his good conduct credits had been revoked improperly under Illinois law, and, therefore, that he had been wrongfully detained beyond his proper release date in violation of the Eighth and Fourteenth Amendments. *Id.* at 699. As a general matter, we agreed with Campbell's premise that, "if through deliberate indifference to the requirements of state law the correctional officials kept him imprisoned too long, his Eighth Amendment rights were violated." *Id.* at 700. Nevertheless, we held that the defendants were entitled to qualified immunity because "it was not apparent [at the time] that this kind of state law mistake rose to the level of an Eighth Amendment violation." *Id.* at 701. We did not consider the merits of Campbell's due process claim. *Id.* at 702.

[23] In *Burke v. Johnston*, 452 F.3d 665 (7th Cir. 2006), Burke, who was incarcerated, brought a § 1983 action claiming that Wisconsin's deliberate indifference to his requests for credit for time he had spent in jail resulted in an unconstitutional prolonging of his incarceration. *Id.* at 668. Relying on *Campbell*, "we agree[d] that incarceration after the time specified in a sentence has expired violates the Eighth Amendment if it is the product of deliberate indifference." *Id.* at 669. Ultimately, however, we remanded the case without deciding whether Burke had prevailed on such a claim. *Id.* at 670.

Eighth Amendment and procedural due process principles).[24]
Other circuits have employed a variety of approaches invok-
ing Eighth Amendment and due process protections.[25] Re-
cently, however, the Supreme Court held that the treatment

---

[24] In *Armato v. Grounds*, 766 F.3d 713 (7th Cir. 2014), we rejected a consti-
tutional challenge brought under circumstances that were somewhat sim-
ilar to the present case. At issue in *Armato* was Illinois' "turnaround prac-
tice" of walking parole-eligible inmates who lacked approved housing to
the prison gate, turning them around, and returning them to custody. *See
Crayton v. Duncan*, No. 15-CV-399-NJR, 2015 WL 2207191, at *4 n.2 (S.D.
Ill. May 8, 2015) (describing turnaround practice)*; Brown v. Randle*, No. 11
C 50193, 2014 WL 2533213, at *1 (N.D. Ill. June 5, 2014); *Murdock v. Walker*,
No. 08 C 1142, 2014 WL 916992, at *3–4 (N.D. Ill. Mar. 10, 2014). Armato
had been convicted of a sex offense in Illinois and sentenced to a prison
term but not to a term of MSR. 766 F.3d at 716. When he became eligible
for release, the administrator in charge of his file was under the impres-
sion that state law required that his sentence include an MSR. *Id.* at 717.
She further believed "that when a previously-convicted sex offender is re-
leased from custody, he is subject to strict MSR conditions such as elec-
tronic monitoring and a suitable host location approved by the IDOC." *Id.*
Because no such housing could be located, the administrator decided that
Armato could not be released. *Id.* She then contacted several of her supe-
riors, who told her that "the appropriate line of action would be to 'violate
[Armato] at the door,'" a reference to the turnaround practice. *Id.* at 718 &
n.2 (alteration in original). In the meantime, another prison official con-
tacted the Illinois Office of the Attorney General ("AG's Office") to request
an amended sentencing order that included an MSR term. *Id.* at 718. Ulti-
mately, the AG's Office decided not to seek an amended order, and Ar-
mato was released. *Id.* at 719.

Armato then brought an action in federal court under § 1983, claiming
that his continued detention violated his Eighth Amendment and due pro-
cess rights. *Id.* We held first that Armato's Eighth Amendment claim failed
on the merits because he had not shown that his detention was the result
of deliberate indifference. *Id.* at 721. We also rejected Armato's Fourteenth
Amendment claim, which we treated as a procedural due process claim.

of a pretrial prisoner is governed by the substantive standards of the Due Process Clause. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). This conclusion seems compatible with the Court's earlier holding in *McNeil v. Director, Patuxent Institution*, 407 U.S. 245 (1972), that the continued detention of a person beyond the expiration of their prison sentence "violates his rights under the Fourteenth Amendment." *Id.* at 246. *But cf. Baker v. McCollan*, 443 U.S. 137, 145 (1979) (holding that "a detention of three days over a New Year's weekend does not and could not amount to" a "deprivation of liberty without due process of law").

---

*Id.* at 721–22. We held that such a claim failed because "the processes undertaken by the defendants were sufficient to address Armato's situation and justify his prolonged detention." *Id.* at 722. The defendants had contacted the AG's Office to pursue an amendment to Armato's sentence, and, in any event, "Armato had numerous sufficient remedies available to him in the state court including a writ of habeas corpus, a writ of mandamus … , and a claim of false imprisonment." *Id.*

[25] *See Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) ("Incarceration beyond the termination of one's sentence may state a claim under the due process clause and the eighth amendment." (internal quotation marks omitted)); *Sample v. Diecks*, 885 F.2d 1099, 1107–18 (3d Cir. 1989) (analyzing under both Eighth Amendment and procedural guarantees of Fourteenth Amendment); *Haygood v. Younger*, 769 F.2d 1350, 1354–59 (9th Cir. 1985) (same). Other courts, however, have expressed a preference to analyze such claims under only the Due Process Clause. *See Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) (holding that plaintiff had failed to state an Eighth Amendment claim because he was "complaining about the fact of his incarceration rather than its conditions," but recognizing a substantive claim under Due Process Clause); *Shorts v. Bartholomew*, 255 F.App'x 46, 51 (6th Cir. 2007) ("[W]hen a prisoner's sentence has expired, he is entitled to release. … This liberty interest is most often attributed to the Due Process Clause of the Fourteenth Amendment.").

Another consideration further convinces us that we should not attempt to reconcile these governing principles here. Mr. Werner has presented the due process argument to us solely as a matter of procedural due process, but we think that *Kingsley*, *McNeil*, and *Baker* suggest that substantive due process principles are implicated here. Rather than resolve definitively that question in a case in which counsel has not squarely raised the issue, we believe the proper course is to focus on the second prong of the qualified immunity inquiry and to determine whether the contours of the right involved were clearly established at the time of the defendants' actions.[26]

A clearly established right is one that "is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent

---

[26] In addition to his claims against those defendants personally involved in his detention, Mr. Werner contends that his individual-capacity claims against the administrators responsible for AD 02-10, Secretary Hamblin (now Secretary Wall) and Division of Community Corrections Regional Chief Snyder-Spaar, were dismissed improperly during screening. In *Childress v. Walker*, 787 F.3d 433 (7th Cir. 2015), we held that "[i]n the case of those responsible for setting policy, liability will result from the institution of a policy that, when enforced, causes a constitutional deprivation." *Id.* at 440 (internal quotation marks omitted). A plaintiff therefore states a claim for relief against prison administrators responsible for a policy where the plaintiff "alleges that prison administrators knew of th[e] practice and knew that th[e] practice put at least some recently released prisoners in jeopardy of losing their freedom, but nevertheless did not alter, change, or otherwise intervene to prevent the harm." *Id.* We thus consider Mr. Werner's claims as they apply to both the defendants personally involved in his detention under AD 02-10 and also those responsible for creating the directive.

must have placed the statutory or constitutional question beyond debate." *Zimmerman*, 807 F.3d at 182 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Supreme Court also has held that, in this context, legal rights cannot be defined at a high level of generality. *See, e.g.*, *id.* ("The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken *in light of the specific context of the case, not as a broad general proposition*." (first emphasis in original) (citation omitted) (internal quotation marks omitted)). For the reasons set forth below, we conclude that a reasonable official would not have known that detaining Mr. Werner pursuant to AD 02-10 was legally impermissible.

In conducting the clearly established inquiry, our first task is to consider controlling Supreme Court and Seventh Circuit precedent. *Abbott v. Sangamon Cty.*, 705 F.3d 706, 731 (7th Cir. 2013). Our earlier discussion makes evident that the precedent of the Supreme Court and of our court certainly did not provide adequate guidance to permit the defendants to understand their responsibilities in the face of the tangle of overlapping laws and regulations that Wisconsin had created.[27] We therefore must "cast a wider net" and look to whether "all relevant case law" demonstrates "such a clear trend … that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Id.*

---

[27] *See supra* notes 20–24 and accompanying text.

(internal quotation marks omitted).[28] In this respect, Mr. Werner identifies a line of Wisconsin state court decisions. In *State ex rel. Olson v. Litscher*, 608 N.W.2d 425 (Wis. Ct. App. 2000), Olson was serving a prison sentence for sexual assault and reached his mandatory release date on March 2, 1999; the DOC, however, had not located a residence for him. *Id.* at 426–27. Consequently, Olson was transferred from a state penitentiary to a minimum security facility, at which point he filed a petition for habeas relief on the ground "that his continued incarceration past his statutorily mandated release date was an unlawful restraint of his personal liberty." *Id.* at 427. Acknowledging that the issue was a constitutional one dealing

---

[28] We are not alone in looking to trends in the decisional law of other jurisdictions once we are satisfied that controlling precedent in our own circuit does not clearly establish a particular legal right. *See, e.g., Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (looking to "clearly established weight of authority from other courts" (internal quotation marks omitted)); *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (considering whether there is "a robust consensus of persuasive authority" (internal quotation marks omitted)); *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (looking to "cases from other courts exhibiting a consensus view" (internal quotation marks omitted)); *Wilson v. City of Bos.*, 421 F.3d 45, 56 (1st Cir. 2005) (looking to "all available case law, including both federal cases outside our own circuit, and state court decisions of the state wherein the officers operated" (citations omitted) (internal quotation marks omitted)); *Turner v. Ark. Ins. Dep't*, 297 F.3d 751, 755 (8th Cir. 2002) (taking "a broad view of the concept of clearly established law" that "look[s] to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit" (internal quotation marks omitted)); *Trulock v. Freeh*, 275 F.3d 391, 407 (4th Cir. 2001) (asking whether there is a "consensus of cases of persuasive authority from other jurisdictions") (internal quotation marks omitted)).

with personal liberty, the Wisconsin Court of Appeals concluded that the continued detention of Olson beyond his mandatory release date was not authorized: Wisconsin law provided that "each inmate is entitled to mandatory release on parole … at two-thirds of the sentence." *Id.* (quoting Wis. Stat. § 302.11(1)). Although the court "realize[d] that it is difficult for the DOC to find a neighborhood that will accept a paroled sex offender in its midst," the above statutory language convinced the court that "[w]hether or not a place has been found for an inmate, he or she must be released on his or her mandatory release date." *Id.* at 427–28. The court noted in closing that there may be "a way for the state to more closely monitor sex offenders for a time between mandatory release and placement"; however, this was not the court's responsibility to determine. *Id.* at 428.[29]

---

[29] *State ex rel. Olson v. Litscher*, 608 N.W.2d 425 (Wis. Ct. App. 2000), came on the heels of a very similar decision by the Wisconsin Court of Appeals in *State ex rel. Woods v. Morgan*, 591 N.W.2d 922 (Wis. Ct. App. 1999). Woods had been convicted of, among other crimes, sexual assault, and he was incarcerated at a state penitentiary. *Id.* at 923 & n.2. When Woods reached his mandatory release date, he was transferred from the penitentiary to a minimum security facility. *Id.* at 923. Several days later, "Woods made sexual overtures to [another] inmate." *Id.* As a result, his parole was revoked, and he was transferred back to the penitentiary. *Id.* Woods then filed a petition for a writ of habeas corpus in state court, contending that his right to due process of law had been violated. *Id.* He argued that although he had been transferred from the penitentiary to the minimum security facility at the end of his sentence, he remained a prisoner and therefore "was subject to prison inmate rules … , not probation and parole regulations." *Id.* at 924. Thus, he argued, his conduct should "have carried an administrative sanction or a loss of prison privileges, not revocation of parole." *Id.* The Wisconsin Court of Appeals granted Woods's petition, con-

The Wisconsin Court of Appeals again considered this issue in *Allen v. Guerrero*, 688 N.W.2d 673 (Wis. Ct. App. 2004), this time in the context of the Eighth Amendment. Allen, who had been convicted of sexual assault, reached his mandatory release date on January 4, 2000, but was unable to secure appropriate housing. *Id.* at 675–76. Instead of releasing Allen to parole as required under Wis. Stat. § 302.11(1), he was transferred to a minimum security facility and placed under the supervision of parole agents. *Id.* at 676. Several months later, the parole agents placed Allen on a "parole hold pending a parole revocation hearing," arrested him, and sent him back to the state penitentiary. *Id.*[30] An ALJ, however, concluded that Allen could not have violated his parole because he had never become a parolee. *Id.* Allen remained in custody, and the DOC initiated a second parole-revocation proceeding; again, an ALJ held that revocation was inappropriate. *Id.* Allen petitioned for habeas relief, which was granted, and he was released to parole. *Id.*

Allen then brought a § 1983 action claiming that his continued incarceration beyond his mandatory release date violated the Eighth and Fourteenth Amendments, and the defendant prison officials raised qualified immunity as an affirmative defense. *Id.* Relying in large part on our decision in *Campbell*, the Wisconsin Court of Appeals held that Allen had

---

cluding that because both the penitentiary and the minimum security facility were state prisons, his status as a prisoner did not change when he was initially transferred. *Id.* at 925. Because Woods never had attained parolee status, his parole could not be revoked. *Id.*

[30] The court's opinion does not make clear why the agents initiated the parole hold and revocation.

made out an Eighth Amendment claim because the defendant's commencement of a second parole-revocation hearing instead of releasing him on parole demonstrated "that they were deliberately indifferent to his plight." *Id.* at 678 (alterations omitted) (internal quotation marks omitted). Proceeding to the second prong of the qualified immunity analysis, the court explained that, after *Olson*, Wisconsin state law was clear that "Allen was entitled to release on parole upon reaching his [mandatory release] date." *Id.* at 679. Thus, "no reasonable public official could have believed that [Allen's] continued detention was constitutionally permissible." *Id.* at 680.

These cases, however, do not comprise a full picture of Wisconsin's legal landscape. In 2005, just one year after the Wisconsin Court of Appeals decided *Allen*, and long before the application of the directive here, the Wisconsin Supreme Court decided *State ex. rel. Riesch v. Schwarz*, 692 N.W.2d 219 (Wis. 2005). Riesch was serving an eight-year sentence for sexual assault; his mandatory release date was July 21, 1998. *Id.* at 220. Riesch's parole supervision rules, which he refused to sign, "required [him] to avoid unlawful activity and conduct that was not in the best interest of the public or his rehabilitation." *Id.* at 221. Riesch's parole agent also decided that, because of the nature of his offense, Riesch "needed to reside at an approved halfway house or residence"; again, Riesch refused to cooperate. *Id.* When Riesch reached his mandatory release date, the DOC initiated a parole hold and transferred him from state prison to a county jail. *Id.* A week later, Riesch's parole agent initiated a revocation proceeding, and an ALJ revoked his parole. *Id.*

Riesch then filed a petition for writ of certiorari, in which he claimed, relying on *Olson*, that the revocation of his parole

was unlawful because he was not released from physical custody upon his mandatory release date and therefore was not a parolee. *Id.* at 222–23. The Wisconsin Supreme Court disagreed. It held that Riesch's case was distinguishable from *Olson* because Riesch, in refusing to cooperate, had "violated the conditions of his parole immediately and simultaneously with his mandatory release date." *Id.* at 223. Importantly, the court also wrote:

> The holding Riesch seeks today is a bright-line rule that elevates form over substance. He contends that inmates must always be released from physical custody before any revocation is commenced, regardless of whether they have signed parole rules, complied with parole rules, or cooperated with their agent. In essence, he is asking for a ritual where the DOC releases uncooperative inmates just outside the prison walls on their mandatory release dates before subsequently placing parole holds upon them.
> …
>
> In the end, we are mindful that the DOC is not free to hold inmates indefinitely for such problems as failure to find suitable housing on its part. *Olson*, 233 Wis.2d at 690, 608 N.W.2d 425. However, we also recognize that the DOC has substantial discretionary authority to develop the rules and conditions for release. *Macemon I*, 208 Wis.2d at 597, 561 N.W.2d 779. *Where inmates violate these terms immediately and simultaneously with their scheduled mandatory release*

> *dates, the DOC should be able to maintain continuous custody*, even though that person's status changes from prisoner serving a sentence to a parolee detained on a parole hold.

*Id.* at 225–26 (emphasis added) (footnote omitted).

The Wisconsin Supreme Court's reasoning in *Riesch* confirms that *Olson* and *Allen* had not put the precise situation addressed by AD 02-10 "beyond debate" in Wisconsin. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). *Riesch* marked the first time that a Wisconsin court had focused on the inherent conflict between a sex offender's right to timely release to supervision and the rules and restrictions governing that release. The Wisconsin Supreme Court's treatment of this dilemma demonstrates that "the right's contours were [not] sufficiently definite that" the defendants in this case would have been on notice that AD 02-10's procedure was unlawful. *City and Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted).

*Riesch* made clear that the DOC's inability to locate appropriate housing does not afford it a blank check to detain indefinitely an individual set for release from imprisonment. However, the Wisconsin Supreme Court was cognizant of the practical difficulties that can arise when release itself conflicts with the "substantial discretionary authority" that DOC has "to develop the rules and conditions for releas[ing]" a person to supervision. 692 N.W.2d at 225. Rather than prohibit absolutely the DOC from detaining individuals caught in this predicament, *Riesch* endorsed a narrow exception: "Where inmates violate these terms immediately and simultaneously with their scheduled mandatory release dates, the DOC should be able to maintain continuous custody." *Id.*

*Riesch* therefore can be read plausibly as acknowledging that, under Wisconsin law, the DOC may "maintain continuous custody" in the unique circumstance where release from imprisonment to a lesser level of restraint would violate the terms of release due to an inability to make practical arrangements for the implementation of that lesser restraint. *Id.* Here, although Mr. Werner's probation violation was not, in strict terms, "immediate[] and simultaneous[]," it was, as a practical matter, an imminent certainty. *Id*. And although his infraction was not, like Riesch's, the product of his recalcitrance, releasing Mr. Werner to probation equally would have "elevate[d] form over substance" to require "a ritual where the DOC releases [noncompliant] inmates just outside the prison walls on their mandatory release dates before subsequently" detaining them. *Id*. To be sure, the length of deferral of release from imprisonment in this case may well have been a fairly aggressive reading of *Riesch*.[31] However, given the lack of clarity with respect to *Riesch*'s outer limits, "we cannot say that only someone plainly incompetent or who knowingly violate[s] the law would have … acted as [the defendants] did."

---

[31] We note that Mr. Werner did have at least one alternative remedy available to him throughout his detention under AD 02-10. Under Wisconsin Administrative Code DOC § 328.11 (now DOC § 328.12), Mr. Werner was allowed to seek review of any "decision which affects [him] personally." *Id.* DOC § 328.11(3). Although this review process would not have permitted Mr. Werner to challenge the lawfulness of his detention directly, *id.* DOC § 328.11(4)(b), it would have allowed him to challenge any of the housing disapprovals underlying his detention, *see Metcalf v. Donalds*, No. 10-C-0615, 2012 WL 2050823, at *6 & n.1 (E.D. Wis. June 7, 2012) (noting that the plaintiff "could have used the complaint process established by § DOC 328.11 to challenge the decisions concerning his housing options").

*Mullenix*, 136 S. Ct. at 310 (first alteration in original) (internal quotation marks omitted).

Because clearly established law at the time would not have notified the defendants in this case that the procedures set forth in AD 02-10 were unlawful, we conclude that they are entitled to qualified immunity on Mr. Werner's claims.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

HAMILTON, *Circuit Judge*, dissenting in part. I respectfully dissent from my colleagues' decision to grant qualified immunity to the policy-making defendants, Hamblin, Snyder Spaar, and Symdon. They adopted and enforced Administrative Directive 02-10. That policy was unconstitutional as applied to someone like Werner, who had reached his mandatory release date and who, through no fault of his own, was unable to find housing that satisfied both local laws and state parole officials. Pursuant to that policy, Werner spent 54 weeks in a county jail when that custody was clearly not authorized by state law. Werner was deprived of his liberty without due process of law.

This case presents an extreme version of a pervasive problem in the criminal justice system. Recidivism is a serious problem with many sex offenders. State and local governments have enacted numerous restrictions on the activities, employment, and housing of released sex offenders. Those restrictions can make it difficult, and in some cases literally impossible, for released offenders to live and work in compliance with all the laws that apply to them. See generally, e.g., *Doe v. Snyder*, — F.3d —, 2016 WL 4473231 (6th Cir. Aug. 25, 2016) (describing restrictions under Michigan law). In this case, the problem was housing. Brown County, Wisconsin, had, we are told, about fourteen separate ordinances restricting released sex offenders.

For more than a year neither Werner nor anyone helping him could find lawful and suitable housing for him. Werner was kept in custody pursuant to the policy that the defendants adopted and enforced. That policy was unconstitutional and contrary to state law even when it was issued in 2002.

To extend qualified immunity to these defendants, though, the majority errs by relying upon a more recent decision by the Wisconsin Supreme Court, *State ex rel. Riesch v. Schwarz*, 692 N.W.2d 219 (Wis. 2005). As explained below, the state court in *Riesch* took care to distinguish its decision from cases like Werner's, in which offenders who reach their release dates are cooperative with efforts to supervise them.

Plaintiff Werner committed serious crimes and was punished severely for them. As a plaintiff, he is singularly unsympathetic. He earned his designation as a "Special Bulletin Notification" offender by committing multiple sex offenses against children. Both during and after the period in question here, he has repeatedly violated the law. He is now back in prison after another crime. Nevertheless, the legal issues in his case extend beyond Mr. Werner and his crimes.

Under the state law governing his conviction and punishment, when Werner reached his mandatory release date, he was entitled to be released from custody, subject to conditions of parole. As the majority opinion recounts, he was not released but was instead locked up in a county jail. He was kept in jail 148 out of 168 hours each week. The remaining 20 hours he was allowed to leave the jail with a chaperone to accomplish the nearly impossible job of finding housing that would comply with all the local laws applicable to convicted sex offenders and with the state's conditions of parole. More than a year after his initial "release" to the county jail, he finally found housing that satisfied all the criteria.

Werner's continued custody in the county jail—and "custody" is the only way to describe those 148 hours per week— was not authorized by state law or by a court judgment after

due process of law. He was quite simply deprived of his liberty without due process of law. Executive branch officials are not authorized to lock people up indefinitely without prior court authorization. The ability to seek a writ of habeas corpus later does not mean the initial deprivation occurs with due process of law. And even a parolee, whose liberty is conditional and constrained, cannot have his parole revoked and his liberty taken away without due process of law. *Morrissey v. Brewer*, 408 U.S. 471 (1972); see also *Atkins v. Chicago*, 631 F.3d 823, 833–34 (7th Cir. 2011) (Hamilton, J., concurring in judgment).

I recognize that the combination of local laws in Brown County and the needs of effective parole supervision placed the defendants at all levels of the Wisconsin parole system in a tough spot. If they had faced Werner's situation without guidance from state law, a defense of qualified immunity would have more merit. But the slate was not clean. Similar problems had arisen before. The state courts had squarely rejected the solution of keeping offenders like Werner in custody past their mandatory release dates.

First came *State ex rel. Woods v. Morgan*, 591 N.W.2d 922 (Wis. App. 1999). Woods was a prisoner who reached his mandatory release date. Instead of being released, he was transferred to another correctional center. Four days later, he made sexual overtures toward an inmate at that new facility, and his parole was revoked. Woods petitioned for a writ of habeas corpus. He argued that he could not have his parole properly revoked because he had never actually been paroled. The Wisconsin Court of Appeals agreed, relying on the fact that Woods had been transferred to a different state prison. He was still deemed a prisoner, not a parolee, even though he

had been held past his mandatory release date. *Id.* at 925. In other words, continued confinement in a state prison was not authorized for a parolee. There was no indication in the record why Woods had not been released on his mandatory release date.

The next year came *State ex rel. Olson v. Litscher*, 608 N.W.2d 425 (Wis. App. 2000), which is the decision most instructive for this case. Like plaintiff Werner, Olson reached his release date, but he was not released because the Department of Corrections was unable to locate a suitable residence for him on parole. He was instead transferred to another state correctional facility. The court held that the State had "no authority to hold an inmate in custody beyond his or her mandatory release date, regardless of whether departmental efforts have secured a residence for the inmate. *Id.* at 426. The court explained: "We realize that it is difficult for the DOC to find a neighborhood that will accept a paroled sex offender in its midst. But there is no gray area in the statute—it is crystal clear. Our job is to apply the statute as it is written. *Whether or not a place has been found for an inmate, he or she must be released on his or her mandatory release date*." *Id*. at 427–28 (emphasis added).

As with Woods, "there was no indication that Olson had done anything to warrant continuous custody at that time." *Riesch*, 692 N.W.2d at 224 (summarizing *Olson*). The State even conceded that Olson had been entitled to release, and no statute or administrative rule authorized the State to detain him past that time.

Then, to bring the point even closer to this civil case for damages, in *Allen v. Guerrero*, 688 N.W.2d 673 (Wis. App. 2004), another inmate was held past his mandatory release

date. The State and Allen had been unable to find suitable housing for him by his mandatory release date. Correctional officials moved Allen to a minimum security prison under the supervision of parole agents. State officials twice tried to revoke this unusual form of "parole," and twice the courts ordered his release. Allen spent all of 2000 in continuous state custody past his mandatory release date of January 4, 2000. He was not released until January 2001.

Allen then sued the state correctional officials in state court under 42 U.S.C. § 1983 alleging violation of his due process and Eighth Amendment rights. The Wisconsin Court of Appeals held not only that Allen had stated a claim for violation of his constitutional rights but that the violation was so clearly established that defendants were not entitled to qualified immunity: "We agree with Allen that *Woods* and *Olson* clearly established" that Allen was entitled to release on parole on his mandatory release date. 688 N.W.2d at 679.

The *Allen* court then rejected a further qualified immunity argument that is echoed in this case. The argument is that because some cases found unauthorized continued custody violated the Eighth Amendment while others found it violated the Due Process Clause of the Fourteenth Amendment, the controlling law was not "clearly established." The Wisconsin Court of Appeals correctly found in *Allen* that the unlawfulness of the continued custody was clearly established in 2000 despite doctrinal arguments about whether it violated one or both amendments. The application of two basic liberties does not weaken the case. It strengthens it. The *Allen* court concluded, as we should, "that no reasonable public official could have believed that such continued detention was constitutionally permissible." *Id*. at 681.

The qualified immunity presents an unusual wrinkle here. Qualified immunity doctrine often indulges in the legal fiction of assuming that official defendants are aware of applicable court decisions. Here, there was no fiction at all. The policy-making defendants issued AD 02-10 after both *Woods* and *Olson* had been decided. The policy even cited both decisions, yet purported to authorize continued custody in the teeth of those decisions.

To avoid reversing the judgment for the policy-making defendants, the majority invokes qualified immunity based on the Wisconsin Supreme Court's 2005 decision in *Riesch*, 692 N.W.2d 219, or, more precisely, based on what the majority generously calls "a fairly aggressive reading" of *Riesch*. A qualified immunity defense is supposed to be based upon objectively reasonable interpretations of existing law. E.g., *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985); *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999). Using *Riesch* as a qualified immunity lifeline for the policy-making defendants is not objectively reasonable. The majority first overlooks the critical distinction drawn by the *Riesch* court itself and then attributes to the Wisconsin Supreme Court in *Riesch* an internal contradiction and confusion that simply are not present. In fact, *Riesch* expressly agreed with *Woods* and *Olson* and took care to distinguish Riesch's case on grounds that apply directly here. It is no surprise that neither the district court nor the defendants, in their brief to this court or in letters to plaintiff, relied on *Riesch* to justify qualified immunity.

Like Werner, Riesch was a sex offender who was nearing his mandatory release date. Unlike Werner, though, Riesch did not cooperate with the release and supervision process.

He announced that he would not participate in the sex of-fender treatment program that was required as a condition of parole. He refused to provide medical information or his sig-nature on his fingerprint record. His behavior was such that the assigned parole agent was unwilling to meet with him un-less he were shackled, and he refused. Riesch had his parole revoked without ever actually leaving state custody. In his challenge to the revocation, he relied on *Woods* and *Olson* to argue that he had never actually been paroled, so that his pa-role could not be revoked and he should be released.

The Wisconsin Supreme Court affirmed the denial of re-lief, but on narrow grounds that distinguished both *Woods* and *Olson* on grounds that apply directly here. The *Riesch* court explained: "*Woods* and *Olson* are unlike the present case because *the inmates in those cases did nothing to warrant their continued detention at the time of their mandatory release date*. In contrast, the inmate in the *Macemon* cases, like Riesch, vio-lated the conditions of his parole immediately and simultane-ously with his mandatory release date." 692 N.W.2d at 223 (emphasis added). The *Riesch* court went on to explain the dif-ference with *Olson*:

> In *Olson*, the inmate petitioned the court of ap-peals for writ of habeas corpus after he was de-tained past his mandatory release date. Olson had been transferred from one correctional fa-cility to another on his release date because the DOC was unable to locate a suitable residence for him. Again [as in *Woods*], there was no indi-cation that Olson had done anything to warrant the continuous custody at that time. Accord-ingly, the State conceded that he was entitled to

release when he reached his mandatory release
date and that no statute or administrative rule
authorized the DOC to detain him past that
point. The court of appeals agreed. *Olson*, 233
Wis.2d 685, ¶ 1, 608 N.W.2d 425.

692 N.W.2d at 224. The *Riesch* court continued: "Unlike the inmates in *Woods* and *Olson*, Riesch engaged in conduct that warranted custody at the time of his mandatory release date," by refusing to cooperate with his social worker in arranging for a suitable residence. *Id*. Riesch was not entitled to relief because he had "stubbornly refused to cooperate with the department's efforts to implement a suitable supervision plan," and he was "totally rejecting active supervision." *Id*., quoting administrative decision.

The *Riesch* court concluded:

In the end, we are mindful that the DOC is not
free to hold inmates indefinitely for such prob-
lems as failure to find suitable housing on its
part. *Olson*, 233 Wis.2d at 690. However, we also
recognize that the DOC has substantial discre-
tionary authority to develop the rules and con-
ditions for release. *Macemon*. Where inmates vi-
olate these terms immediately and simultane-
ously with their scheduled mandatory release
dates, the DOC should be able to maintain con-
tinuous custody, even though that person's sta-
tus changes from a prisoner serving a sentence
to a parolee detained on a parole hold.

*Id.* at 225. The *Riesch* court rejected a highly formalistic rule advocated by Riesch, but it did not disagree with *Woods* or

*Olson*, nor did it purport to authorize the continued custody of a parolee who was not deliberately violating the terms of his parole.

Yet the defendants' policy, AD 02-10, purported to authorize exactly such continued custody. At least after *Woods*, *Olson*, and *Allen*, and certainly in light of the distinction drawn in *Riesch*, reasonable policy-making officials could not have believed that they were authorized to keep offenders like Werner in jail after their mandatory release dates. Instead, they doggedly stuck to the policy, even telling Werner that "Case law upholds the procedures" of AD 02-10, without identifying the case law. Dkt. 113-1, at 82 (Feb. 16, 2010 letter from defendant Snyder Spaar to plaintiff Werner).

The policy-making defendants should have known that AD 02-10 would result in unconstitutional deprivations of liberty in cases like Werner's, where the parolee did not deliberately fail to comply with parole conditions. I would allow the qualified immunity defense for the local parole agents and their supervisors who had been ordered to implement AD 02-10, but we should reverse for trial on the claims against the policy-making defendants.